[Crim. No. 158.  Third Appellate District.—January 26, 1912.]

## THE PEOPLE, Respondent, v. W. P. BURKE, Appellant.

CRIMINAL LAW—EXPLOSION OF DYNAMITE AT DWELLING—PROVINCE OF JURY—SUPPORT OF VERDICT.—Where the defendant was charged with the offense of the explosion of dynamite at a dwelling with intent to injure and kill an inmate, and was convicted thereof, the jury is the sole judge of all questions of fact, and its finding based upon evidence upon any controverted question is conclusive on this court. It is held, upon a statement of the evidence, that it is not only sufficient to support the verdict, but that it is persuasive, satisfactory and convincing as to the guilt of the defendant.

ID.—SUFFICIENCY OF INDICTMENT FOR EXPLOSION OF DYNAMITE AT DWELLING.—An indictment under section 601 of the Penal Code, charging that defendant, on a specified date and in a specified county, "did willfully, unlawfully, feloniously and maliciously deposit and explode at, in and near a dwelling-house, being a tent-house and place where human beings did then and there and theretofore usually inhabit, assemble and frequent, pass and repass, dynamite, Hercules powder, and other chemical compounds and explosives, with the intent then and there to injure Lu Smith, a human being, and that by means of said deposit and exploding of said explosives, said Lu Smith was thereby injured and endangered," sufficiently states the offense, and meets all of the requirements of the Penal Code, and a demurrer thereto was properly overruled.

ID.—LOCATION OF TENT-HOUSE—IDENTIFICATION OF CRIME—PROTECTION FROM FURTHER PROSECUTION—PROOF OF PARTICULARS.—Though the location of the tent-house might have been more definitely stated,

yet, in so far as locality is concerned, it was sufficient under the indictment to aver that the offense was committed in the county. This, in connection with the name of the person injured, and the substantive averments of the crime, makes the identification thereof complete, which not only answers every purpose of good pleading, but would also protect the defendant from any future prosecution for the same offense, at the time set forth, at any place within the jurisdiction of the superior court of the county, upon which, under a plea of "once in jeopardy," defendant may show the particulars of the former offense to identify the same by extraneous evidence.

EVIDENCE—GOOD REPUTATION OF DEFENDANT FOR PEACE AND CHASTITY —PROPER CROSS-EXAMINATION—HEARING OF CONTRARY PARTICU-LARS.—Witnesses offered to show the good reputation of the defendant for peace and chastity were properly asked by the district attorney on cross-examination if they had not heard that the defendant, as a physician, had made a practice of committing abortions, and as to his having improper intercourse with women, and taking undue liberties with female patients. Such questions were properly permitted by the court, as affecting the weight of the testimony as to defendant's reputation.

ID.—RULE AS TO SCOPE OF CROSS-EXAMINATION OF CHARACTER WITNESSES.—The rule is that on cross-examination of character witnesses, they may be asked as to specific reports concerning the trait of character involved, if they have a tendency to establish the bad reputation, although they may not be sufficient for that purpose.

ID.—QUESTION DISALLOWED—INDICTMENT OF DEFENDANT IN ANOTHER COUNTY—MISCONDUCT NOT ESTABLISHED—PRESUMPTION UPON AP-PEAL.—The fact that the court disallowed a question asked by the district attorney of a character witness for defendant whether he had not heard that the defendant was indicted in another county does not establish misconduct of the district attorney in asking it, in the absence of any showing that he asked it in bad faith. It must be presumed·upon appeal. that the district attorney was conscientiously discharging his duty as he understood it.

ID.—LIMITING NUMBER OF CHARACTER WITNESSES—DISCRETION NOT ABUSED.—It is held that the court did not abuse its discretion in limiting the number of character witnesses to thirteen, when no evidence was offered by the prosecution to impeach that reputation. There must necessarily be a limit to such inquiries, and it is for the court to prescribe it in such manner that it is not likely that any additional witnesses would add weight to the large number of un-impeached and uncontradicted witnesses introduced.

ID.—DATE OF ILLICIT RELATIONS BETWEEN PROSECUTRIX AND DEFENDANT —IMPEACHMENT ON CROSS-EXAMINATION—EXPLANATION ON REDI-RECT EXAMINATION.—Where the prosecutrix had stated on direct

examination that her sexual intercourse with defendant began at Oakland in June, 1906, and she was impeached on cross-examination by her evidence before the grand jury that in April, 1906, defendant, at his sanitarium, "did things that no physician should do with a patient," she was properly allowed on redirect examination to answer the question, "What were these things?" by way of explanation, and to state facts and circumstances tending to correct or repel any wrong impressions or inferences arising from the matter drawn out on cross-examination, though defendant's case may be prejudiced thereby.

Id.—Expressed Motive in Procuring Dynamite from Mine—Proper Evidence — Prior Self-serving Declarations — Hearsay. — The statement made by the defendant at the time when he procured the dynamite from a mine in Butte county, which was subsequently exploded at the tent of the prosecutrix, as to his then expressed purpose and motive in procuring it, it was admissible, as calculated to elucidate and explain the character and quality of the act, and so connected with it as to constitute one transaction. But prior self-serving declarations to third persons made several days before the visit to the mine, which were no part of the *res gestae*, were properly excluded as inadmissible hearsay.

Id.—Inducement to Prosecutrix to Leave State—Payment by Agent for Defendant—Circumstantial Proof—Question for Jury—Admonition.—The court properly admitted evidence that a woman named, who had no money of her own, paid $750 to the prosecutrix to leave the state before the trial of the defendant, and it is held that all of the circumstances proved warranted the reasonable inference that she was the agent of the defendant in inducing such departure from the state, and that the court properly submitted the whole of the evidence to the jury, with the admonition, "Unless you are satisfied from all the evidence in the case that the defendant did cause or authorize the persuasion or disappearance of such witness, you cannot consider it as a circumstance against the defendant."

Id.—Proper Evidence of Witness Acquainted With Woman.—The evidence of a witness acquainted with such woman for several years, and who had opportunity to know the facts, was properly admitted to show her movements and financial condition, which were material and relevant matters. In weighing such testimony, the court or jury should consider the means of knowledge of the witness, and all facts tending to illustrate his credibility and the weight of his testimony.

Id.—Conspiracy—Circumstantial Evidence—Inference of Jury.—In proving a conspiracy, it need not be shown that the parties actually came together and agreed to enter into and pursue a common design. The existence of the assent of minds which is involved in a conspiracy may be, and from the secrecy of the crime usually

must be, inferred by the jury from proof of the facts and circumstances which, taken together, apparently indicate that they are merely parts of some complete whole.

ID.—ILLICIT RELATIONS OF PROSECUTRIX WITH OTHER PERSONS—PARENTAGE OF CHILD.—Where a child was shown to have been born from the prosecutrix, which she testified was the result of her illicit relations with defendant, who as a physician attended its birth, the court properly confined questions as to her illicit relations with other men to a period of time bearing solely upon the question of the parentage of the child, as to which there was no contrary evidence. She could not be impeached by evidence of prior particular wrongful acts, not bearing upon such parentage nor questioned in relation thereto.

ID.—CLAIM BY DEFENDANT OF POSSESSION OF ORIGINAL DYNAMITE—REBUTTAL—EVIDENCE OF SUBSTITUTION.—Where the defendant claimed to have kept the original dynamite purchased at the mine and to have it on the premises, it is held that there was sufficient proof in rebuttal that the dynamite upon the premises was purchased since the explosion of the other dynamite at the tent of the prosecutrix, and was substituted therefor, and that such substitute was procured by an agent of the defendant acting in his behalf.

ID.—PROPER EXHIBITION OF CHILD IN COURT BY PROSECUTRIX—PROVINCE OF JURY—QUESTION OF SIMILARITY TO DEFENDANT.—The prosecutrix had the right to bring her child with her into court, and to have it in her arms when testifying to its paternity by the defendant. In view of the question as to its paternity, it was proper to submit the child to the inspection of the jury, who were the judges as to whether or not it resembled the defendant, and unless such resemblance existed, its production in court would be in the defendant's favor.

ID.—EVIDENCE—GENEROUS DISPOSITION OF DEFENDANT.—The court did not err in rejecting evidence as to the generous disposition of the defendant. Such incidental and remote traits of character are not involved in the proper evidence of character.

ID.—MENTAL CONDITION OF PROSECUTRIX—INQUIRY NOT RESTRICTED.—It is held that the superior court did not improperly restrict the cross-examination of the prosecutrix as to her mental condition, and that there was no restriction or denial of the defendant's right to the broadest inquiry of witnesses as to her sanity.

ID.—EVIDENCE OF OTHER OFFENSES—CONNECTION WITH OFFENSE CHARGED.—Whenever there is a clear and logical connection between two or more offenses and the offense charged, either as bearing upon the motive for that offense or as indicating the guilt of the defendant in committing the same, the evidence of such other offenses is admissible against the defendant.

ID.—OFFENSES INDICATING MOTIVE.—Evidence of the illicit relations between the defendant and the prosecutrix and the parentage of the child were clearly admissible as bearing upon the motive of the defendant to commit the offense charged.

ID.— OFFENSES INDICATING CONSCIOUSNESS OF GUILT OF OFFENSE CHARGED.—The offenses of subornation of perjury, and the preparation of false and substitute evidence to indicate the continuous possession of the dynamite which was exploded at the tent of the prosecutrix, and of inducing the prosecutrix to leave the state, and of defendant's attempt to poison her after the commission of the offense charged, all indicate the defendant's consciousness of his guilt of that offense.

ID.—WRITTEN STATEMENT OF PROSECUTRIX FOR USE ON CROSS-EXAMINATION—ERROR NOT APPEARING.—No prejudicial error appears in the action of the court in declining to order the district attorney to deliver to defendant's counsel a written statement of the prosecutrix prepared to be used on the district attorney's cross-examination of the sheriff, when the sheriff was not asked concerning it, and it does not appear that he had seen it, nor was it demanded on the examination of the prosecutrix, and where, without reference to whether it could be used on cross-examination or not, its contents do not appear in the record on appeal.

ID.—FOUNDATION NOT LAID FOR IMPEACHMENT.—Where a document, in so far as it appears material, could only be used on cross-examination to impeach the witness, but no foundation was laid for such impeachment, he cannot complain of the court's action in that regard.

ID.—DEFENSE OF ALIBI—PROPER EVIDENCE NOT RESTRICTED—OPINION— DECLARATIONS NOT PART OF RES GESTAE.—It is held that the court did not restrict any proper evidence offered in support of the defense of alibi of the defendant when the explosion took place, but it properly sustained an objection to certain questions calling for the opinion or conclusion of the witness, and also properly excluded his declarations which were not part of the *res gestae* of the explosion which caused the injury, but were made at a different time and place, which could in no way be considered a part of the transaction.

ID.—EXPERT EVIDENCE—MOST PRACTICAL WAY TO REMOVE ROCKS— QUESTION FOR JURY.—A witness qualified as a mining engineer was properly held not thereby entitled to state from his experience "what would be the most practical way to remove those rocks" from defendant's ground, for the reason that this was not the subject of expert testimony, but was a matter for the jury to determine from evidence explaining the situation as to the rocks.

ID.—SECRECY OF DEFENDANT IN OBTAINING DYNAMITE FROM MINE— PROVINCE OF JURY.—It is held that a question as to whether there

was "any secrecy" about the defendant's "statements or movements or his actions in connection with the getting of the powder," which was obtained from the mine, called for an inference or conclusion within the exclusive province of the jury.

ID.—REQUEST NOT TO TELL "AT ANY TIME."—It is held that a question as to whether defendant said anything at the mine "at any time while he was there, asking you not to tell about giving the powder," would not be admissible. The question should have been limited to the time when defendant procured the dynamite.

ID.—ARGUMENT OF DISTRICT ATTORNEY—WIDE RANGE TO BE ALLOWED.— In the argument of the district attorney before the jury, the range of discussion, illustration and argument is properly very wide. Matters of common knowledge and historical facts may be referred to and interwoven in such argument; and allusion may be made to the prevalence of crime and the duty of the jury. He may express his belief as to the guilt of the defendant, and that the facts are sufficient to convince anyone of his guilt.

ID.—ALLUSION IN ARGUMENT TO PEOPLE OF STATE—ABSENCE OF PREJU- DICE—CORRECTION BY COURT.—Where the district attorney alluded in his argument to a law that is "equal for the rich and the poor," the proper administration of which "will enjoy the confidence and deserve the reverence of the people of our state," and then stated: "To-night the people of the state look here to you. They are not looking here to find out whether or not the defendant is guilty. They have conceded that he is. They are looking here to find out if a court of justice is to declare him so,"—it is held that if such remarks be considered improper, it must be presumed that any injurious effect was forestalled or removed by the ruling of the court that "that statement as to what the people or other persons think about it is to be disregarded by the jury."

ID.—PROPER INSTRUCTION—GUILT BASED UPON PERSONAL ACT, OR UPON BEING ACCESSORY.—The court properly instructed the jury that "if you are satisfied from the evidence beyond a reasonable doubt and to a moral certainty that the crime charged in the indictment was directed by the defendant, it would be your duty to find him guilty. So, too, if you should be likewise satisfied from the evi- dence in the case that the explosive was deposited and exploded by some other person whose identity is unknown, and you should also be satisfied from the evidence beyond a reasonable doubt that the defendant was concerned in the commission of such crime as above explained, but that he did not directly commit the act constituting the offense, but aided and abetted in its commission, or not being present, advised and encouraged its commission, you should likewise return a verdict of guilty."

ID.—DISTRICT ATTORNEY NOT REQUIRED TO ELECT—PROPER INDICTMENT AS PRINCIPAL—PROOF OF EITHER RELATION.—The district attorney

is not required to elect whether he will prosecute or ask for a con-
viction upon the ground that the defendant is the principal or an
accessory before the fact; but he may ask for a verdict if the
evidence satisfies the jury under either alternative, if there is evi-
dence that the crime was actually committed.  Since the defendant
can be charged in the indictment as principal, whether he actually
committed the offense or was an accessory thereto before the fact,
he can be justly convicted thereunder if the evidence shows that
he acted in either relation.

ID.—ABSENCE OF ERROR IN INSTRUCTIONS OR TENABLE GROUND OF RE-
VERSAL.—It is held that there was no error in the instructions of
the court, and that there is no tenable ground for interfering with
the verdict of the jury or with the judgment of the trial court.

APPEAL from a judgment of the Superior Court of
Sonoma County, and from an order denying a new trial.
Emmet Seawell, Judge.

The facts are stated in the opinion of the court.

J. R. Leppo, W. F. Cowan, and J. A. Cooper, for Appellant.

U. S. Webb, Attorney General, J. Charles Jones, Deputy
Attorney General, and Clarence F. Lea, District Attorney of
Sonoma County, for Respondent.

BURNETT, J.—This case has many peculiar features, and
it has excited wide public interest on account of the nature
of the charge and the prominence of appellant.  He is a
physician of high standing in his profession, a man of afflu-
ence and of many friends, and, prior to the unfortunate
occurrence which gave rise to his prosecution, he bore an
enviable reputation in the community, not only for the qual-
ities involved in the accusation but—so it is claimed—for
prominence in the manifestation of those traits of character,
generally, that distinguish the benevolent and upright citizen.
The case was prosecuted and defended with great pertinacity
and rare ability.  The trial lasted for seven weeks and a
mass of testimony was taken, which, in six volumes of over
five hundred pages each, has been submitted to this court.
The printed arguments filed herein comprise something like
a thousand pages, in which every possible phase, seemingly,
of the propositions of law involved in the record has been

forcibly and persuasively presented by distinguished counsel, who have certainly spared no effort to assist the court in the arduous task of reaching a just and legal determination of this appeal. It would be impossible, within reasonable limits, to discuss fully the various points made by appellant. Indeed, it seems hardly practicable or requisite to notice specifically all of the grounds of attack upon the judgment to which our attention has been invited. The author of an opinion should, of course, keep in mind the constitutional provision requiring an appellate court to give the reasons for its conclusion, and should have a due regard for the gravity of the offense and the possible bearing of the opinion as a precedent in the future. He should also be not unmindful of the valuable assistance of counsel, but, manifestly, he must follow his own judgment as to the degree of elaboration to be accorded to the treatment of any proposition and as to the questions which are worthy of notice at all.

In view of much of the argument of appellant, it seems appropriate, at the outset, to declare that, in our attention to the question of the guilt of defendant or of the sufficiency of the evidence to establish any fact in issue, we have been guided by the familiar and oft-repeated principle so forcibly stated in *People* v. *Ruef,* 14 Cal. App. 583, [114 Pac. 57], by Judge Cooper, who was then the presiding justice of the first district court of appeal, as follows: "In the discussion of this question it must be borne in mind that we have the power only as a matter of law to say as to whether or not there is sufficient evidence, conceding every syllable of it to be true, to support the ultimate finding of the jury. The jury is the sole judge of all questions of fact, and its finding, based upon evidence, upon any controverted question is conclusive on this court. It has the right to believe or to disbelieve any witness, and draw all reasonable inferences from the facts proven." And, also, in *People* v. *Durrant,* 116 Cal. 200, [48 Pac. 79], where the supreme court, through Mr. Justice Henshaw, goes so far as to say that where a witness has absolutely discredited his own testimony "by swearing to opposite statements so that one or the other must be false, under our laws his testimony is not of necessity to be rejected," and the jury, while they are bound to look upon it with suspicion, may accept as true one or other of the contra-

dictory asseverations. "Thus," as it is said, "upon a review of the evidence by this tribunal we may not examine with minuteness claims that witnesses are discredited or that their testimony is unworthy of belief, or look to see whether some other conclusion might not have been warranted by the evidence." This exclusive function of the jury as to the determination of the facts is well known, of course, to all the profession, but it is surprising that in so many instances it seems necessary to remind even leaders of the bar of the existence of the rule and of its vital importance in the determination of cases on appeal.

Much space is devoted in appellant's brief to the maintenance of his contention that the indictment is fatally defective and that therefore his demurrer thereto should have been sustained. He even states that he has not the patience to discuss the proposition, and that it seems clear to him that "This court cannot, without setting aside all rules and precedents, and ignoring all learning and reverence for the law of our ancestors, hold this indictment sufficient, when it fails to state or describe in any manner the place where the explosion occurred." The offense is defined in section 601 of the Penal Code. Therein is penalized the use of explosives for certain enumerated purposes. The charging part of the indictment here, following substantially the language of said section describing the alleged offense, is as follows: "The said W. P. Burke, on or about the fifth day of February, A. D. 1910, at and in the county of Sonoma, State of California, did willfully, unlawfully, feloniously and maliciously deposit and explode at, in and near a dwelling-house, being a tent-house and place where human beings did then and there and theretofore usually inhabit, assemble and frequent, pass and repass, dynamite, Hercules powder and other chemical compounds and explosives with the intent then and there to feloniously injure Lu Smith, a human being, and that by means of said deposit and exploding of said explosive said Lu Smith was thereby injured and endangered." It cannot be disputed that the indictment charges an offense defined in said section of the Penal Code and that said offense is shown to be within the jurisdiction of the court. Neither can there be any doubt, as we view it, that the indictment meets the requirement of sections 950, 951 and 952 of the

Penal Code.  The act is identified by these circumstances, as pointed out by respondent: 1. The date satisfies the demand of section 955 of the Penal Code; 2. The offense was committed in Sonoma county; 3. The explosion occurred near a dwelling-house, being a tent-house; 4. Said tent-house was occupied by human beings and it was a place where they assembled and passed and repassed; 5. Dynamite was the explosive used; 6. The act was maliciously done; 7. The intent of the defendant was then and there to feloniously injure one Lu Smith; and 8. By means of said explosive said Lu Smith was then and there injured.

The location of the tent-house might have been more definitely indicated, but it is clear that appellant has suffered no injury by the want of greater particularity in the averment. In this respect there would seem to be no difference in principle from other cases of personal injury or of felonious assault. In a charge of assault with a deadly weapon or with intent to commit murder, for instance, it is admitted that it is sufficient, so far as the locality is concerned, to aver that the offense was committed in the county. This, in connection with the name of the person sought to be injured and the substantive averments of the crime, makes the identification complete and answers every purpose of a good pleading. "The facts necessary to be set forth are provided in the statute, and whenever it is substantially followed, so as to put the prisoner upon fair notice of the offense charged and the time, place and circumstances necessary to constitute the crime, it will be sufficient." (*People* v. *Thompson,* 4 Cal. 240.) Looking at the matter in its practical aspect, it is manifest that no substantial right of the defendant was invaded or imperiled. He knew whether the offense charged was committed by him in any part of Sonoma county. This knowledge would enable him to prepare and present his defense. And, as far as any future prosecution is concerned, the indictment would protect him in his answer to any charge of the same offense committed at the time set forth at any place within the jurisdiction of said superior court. If there should be any doubt as to this, his plea "of once in jeopardy" could be supported by extraneous evidence to identify the particular offense for which he has been tried and thus he would be amply protected. In the light of the trial itself, it may be added, it is made per-

18 Cal. App.—6

fectly clear that appellant was not embarrassed by the asserted infirmity in the indictment and that he need have no fear of another conviction under a different pleading for the same offense. The following authorities, cited by respondent, bear more or less upon the sufficiency of the indictment, and they lend support to the ruling of the trial court upon the demurrer: *People v. Avila*, 43 Cal. 199; *Ex parte Helbing*, 66 Cal. 215, [5 Pac. 103]; *People v. Platt*, 67 Cal. 23, [7 Pac. 1]; *People v. Sheldon*, 68 Cal. 435, [9 Pac. 457]; *People v. Anderson*, 80 Cal. 205, [22 Pac. 139]; *People v. Frigerio*, 107 Cal. 152, [40 Pac. 107]; *People v. Faust*, 113 Cal. 172, [45 Pac. 261]; *People v. Prather*, 120 Cal. 660, [53 Pac. 259]; *People v. Barnnovich*, 16 Cal. App. 427, [117 Pac. 572]; *State v. Snead*, 16 Lea (Tenn.), 450, [1 S. W. 282]; *State v. Shaw*, 35 Iowa, 575; *Spencer v. State*, 13 Ohio, 407; 2 Bishop's New Criminal Procedure, sec. 135.

The cases cited to the point by appellant are easily distinguished from the one at bar and we deem it unnecessary to notice all of them specifically. They mostly relate to injuries to property and some fact essential for identification was omitted. The two following citations, however, relate to personal injuries: In *People v. Perales*, 141 Cal. 581, [75 Pac. 171], the charge was of an assault by means likely to produce great bodily injury. The supreme court, through Mr. Justice Lorigan, held that a more particular statement of facts was necessary to charge the offense definitely and certainly since, under the statute, the terms used had no precise or technical meaning, and that it was not a case where the statute designates and specifies particular acts or means whereby the offense is committed. In *People v. Mahoney*, 145 Cal. 104, [78 Pac. 354], the indictment was for the presentation of a false and fraudulent claim, and it was held, in accordance with the well-established rule in relation to fraud, that the particular acts and facts which make the claim fraudulent should be averred. Here, as we have seen, the facts constituting the offense were alleged substantially in the language of the statute, those facts need no definition nor explanation, and the time and place were sufficiently designated.

Appellant has displayed no lack of ingenuity or of courage in his discussion of the question of the sufficiency of the evidence to support the finding of the jury. The method, how-

ever, adopted, according to which the evidence is considered
piecemeal without regard to the cumulative and convincing
effect of the inculpatory circumstances in the aggregate, is
probably the only course that could be pursued with any
plausibility or hope of success in a case like this.   We do not
propose to argue the probative value of the various circum-
stances upon which the people relied for a conviction.   We
think the mere statement of some of the important facts, which
we must accept as established to the satisfaction of the jury,
carries with it the conclusion that the verdict represents a
rational inference from the evidence.

For many years appellant had been at the head of an in-
stitution known as Burke's Sanitarium, located about five
miles from Santa Rosa, in Sonoma county.   At the time of
the offense he was of the age of sixty or thereabout and one
Lu Smith of the age of forty.   In 1901, being ill, she came
to the sanitarium and she was given osteopathic treatment by
appellant.   Subsequently she accepted employment from him
and so continued, with some intermission, till the spring of
1906.   She then went away for a short time but returned in
June and remained till the 1st of September.   After that she
resided at different places and frequently visited appellant
at his office in Oakland or San Francisco.   In the summer of
1906 appellant addressed to her a long communication on the
subject of the proper relation of the sexes, with a request that
she read and return to him.   This communication was read
to the jury on the request of the defense.   His opinions
therein advanced seem rather startling in view of appellant's
reputation in the community.   He declared that the "volun-
tary family" was to take the place of the old-fashioned
family; that while a "natural marriage may not be legal,
but legal is not as high an authority as the natural"; that the
"noble woman" is the one who has the courage to live
"nature's ways" no matter what the result and regardless of
the popular standard of morals; that sex is not enjoyed to the
full "until you have sublimized it to the fineness of the rapture
of affinity"; that "such a ceremony is lawless, wordless and
thoughtless," and that Nature says: "Be utterly passionate
where there is affinity and then it will be pure."   Miss Smith
seems to have been duly impressed with the beauty and verity
of these sentiments, as she and the doctor assumed illicit rela-

tions in June, 1906, and their meretricious conduct continued at intervals for a long time thereafter, the doctor supporting her in the meantime, and in June, 1908, while appellant was visiting her at the home of a Mrs. Macy in San Francisco, conception took place. After Miss Smith knew she was to become a mother she told the defendant and, after consultation, it was decided that she should go to the Burke Sanitarium. When she arrived there she was introduced as Mrs. Smith by appellant, and, according to his directions previously given, she so signed her name on the register. She had no money and appellant paid for her maintenance at the sanitarium for some time. On the 12th of March, 1909, a child was born to her, appellant being the attending physician. About the 1st of August, 1909, she moved into the tent-house where the explosion occurred, the tent being located near some cottages on a road running through the sanitarium grounds. The first disturbance between appellant and Lu Smith occurred some time in June, 1909, when she said to him, in the presence of others: "You have time to see everybody else except your own child." This was the first time she had publicly accused him of being the father of the child and it become noised about. She called him a coward and said he was afraid to face the consequences of his own act. On another occasion she had with him a heated controversy over his neglect of the child and, in great anger, he seized her by the throat. In November she concluded to leave the sanitarium but appellant dissuaded her from doing so. On the seventeenth day of December she telephoned to an attorney in San Francisco in reference to her troubles and this was reported to appellant, who, the following day, left for his mine in Butte county and there obtained four sticks of dynamite. The mine is located about twenty-four miles from Oroville. Appellant left Oroville on the morning of the 19th of December and drove to the mine and returned that evening. At the mine he asked for dynamite "to take down to blow a rock out of the ditch or grounds around the sanitarium." He stated he had not seen any dynamite used and a small charge was prepared and exploded in his presence. He claimed that he had "an old miner down there around the sanitarium that knew how to use it, and he would be in no danger with it." No evidence was introduced at the trial that there was any such

miner at the sanitarium. There was only one piece of fuse taken by appellant, about three feet long, although there were several rocks that the defendant claimed he wanted to remove. The defendant was shown at the mine how to light the fuse, and it may be said that the fuse found at the place of the explosion corresponded in appearance with that which appellant obtained. He took the dynamite away from the mine and arrived at Fulton, a few miles from Santa Rosa, on the evening of December 20th, where he was met by Dr. Hitt, of the sanitarium. Appellant carried a satchel on his knees in the buggy and Dr. Hitt advised him to set it down between their feet but he continued to hold it. Appellant did not tell Dr. Hitt or anyone else that he had any dynamite. No other person knew anything about it being on the premises. Appellant had it in his possession at the sanitarium for forty-six days preceding the explosion, yet no attempt was made to blow the rocks from the ditch and they were still there at the time of the trial. After Lu Smith, in the presence of others, had reminded appellant that he was the father of her child, appellant began to charge her with insanity and falsely stated to different persons that she had threatened "to blow herself up and he feared that she was going to do it." Being asked how he thought she would accomplish it, he said: "It may be dynamite, or something of that nature." He also declared that it would be better if she and the child were both dead. Thursday before the explosion he promised to give the woman money in a few days. The next day he told her he had a check and he would have it cashed when he would give her the money. He asked her whether the baby's crib was "by the side of the bed or at the foot" in the tent. Sometime before that he went to the front of the tent, stepped on to the porch, looked in at the open door where he had a view of the location of the bed and baby's crib, and, feeling of the canvas, he remarked to the girl who was caring for the baby: "This is a nice tent." On Saturday, the day of the explosion, he again excused himself for not furnishing her the money, and she threatened to go away and bring suit against him. That night, February 5, 1910, about 7 o'clock, an attorney connected with the office of the attorney to whom she had previously telephoned arrived at the sanitarium and appellant was informed of his arrival. On the evening of the

explosion, about a quarter to 8, a Mr. Dillard, clerk of the sanitarium, left the sanitarium building and started toward his own cottage, which was westerly from the Lu Smith cottage. At this time Miss Smith was away from her tent and the light was out. Temporarily stopping in the road—not far from said tent—he saw Dr. Burke approaching him from the sanitarium, walking rapidly. The night was dark and when appellant reached a point within ten or fifteen feet of the witness the former turned and practically retraced his steps. No word was spoken between them. The dynamite that caused the explosion was attached to the wall of the tent above the wooden wall that came up near the top of the bed occupied by Miss Smith, the bed being immediately against the wall. She went to bed about 8 o'clock. She had put the baby in its crib and put out the light previous to that time and had gone to the bathroom some distance away to take a bath, leaving the baby alone, asleep. It was the theory of the prosecution that this was the time when Dillard saw appellant, and that the latter had taken advantage of the absence of Miss Smith to attach the dynamite to the outside wall of the tent. The explosion occurred about 9:30 o'clock and was that of dynamite. The woman was burned considerably and her flesh was torn in several places, especially on one of her arms. Under similar conditions as those existing at the tent, the prosecution made an experiment with the explosion of the same amount of dynamite as that secured by appellant as aforesaid and obtained similar results as to the force of the explosion and the marks on the tent. Shortly after the explosion appellant, standing near the tent, said: "I guess that girl has blown herself up," and the next morning he stated that it was too bad the explosion had not killed her as the baby would be better off without her. He was advised that the explosion should be investigated by the authorities, and he declared that "the matter would right itself" and that he "did not think an investigation was necessary." After witness Dillard had reported the explosion to the authorities appellant declared to him that he was too officious and that he had directed his brother, Alfred Burke, to telephone to the officers not to come and had sent to them a letter to that effect. The explosion was reported by Mr. Dillard to the sheriff about noon on the 6th of February, and Alfred

Burke delivered the letter about 4 o'clock in the afternoon. In this letter to the sheriff appellant stated that the explosion occurred "in the tent of a patient who is unbalanced in mind" and that she "will probably die as the result of the explosion," and "We do not know that she did it but think she did as she has repeatedly threatened 'to blow herself up.' We are quite able to cope with the situation, without troubling you." When the sheriff talked to him on that afternoon appellant stated that he had not known of any explosives being on the place. One week later two other peace officers interviewed him at the sanitarium and he was asked if there had been any dynamite or explosive on the premises and he replied that he "knew of no reason why any should have been used on the place, unless at the time of building a water flume there several years ago," and, on being further questioned, he stated positively that he knew of "no blasting powder or dynamite ever being on the place." Immediately after the explosion one Doctor Dessau, who was employed by appellant at the sanitarium, treated Miss Smith. He did not believe she was going to die, but appellant predicted her death. For some unexplained reason, Doctor Dessau was withdrawn from the case within a day or two and appellant took charge. He applied to the wound on the arm of Miss Smith a preparation contained in a box upon which was written, in appellant's handwriting, "Boracic acid." It contained, however, quite a percentage of arsenic, and it was a rational inference, from the surrounding circumstances, that appellant contemplated that the death of Miss Smith would be the result of the continued application of this "slow poison." His plan, however, was interfered with by the action of the district attorney.

The foregoing is not by any means an exhaustive *résumé* of the case for the people. Other circumstances of moment appeared to fortify the conclusion reached by the jury, two of which will be noticed in connection with the consideration of the question as to the admissibility of evidence. As to the showing made by the prosecution, it is sufficient comment to declare that seldom is such a case of circumstantial evidence made out. It is not only sufficient to support the verdict, but it is persuasive, satisfactory and convincing. Furthermore, it may be said that it seems difficult to under-

stand how anyone can read the cold record, dispassionately and without bias, and not be impressed with an abiding conviction of appellant's guilty participation in the crime charged against him.

Appellant complains bitterly of the conduct of the district attorney in his cross-examination of the character witnesses for the defense. Those witnesses testified to the good reputation of defendant for peace and quiet and also for chastity. On cross-examination they were asked if they had not heard that defendant had made a practice of committing abortions, and having improper intercourse with women and of taking undue liberties with female patients. The court permitted these questions but sustained an objection to the question asked of one witness if he had not heard of the defendant having been indicted by the grand jury of Lake county. No complaint is made of any question asked of the defendant himself. Under the authorities, the questions allowed by the court were properly permitted as affecting the weight of the testimony in relation to defendant's reputation. The district attorney did not claim anything as to the verity of the matters suggested or implied in his questions. The rule is that, on cross-examination of character witnesses, they may be asked as to specific reports concerning the trait of character involved, if they have a tendency to establish the bad reputation, although they may not be sufficient for that purpose. In *People* v. *Ah Lee Doon*, 97 Cal. 179, [31 Pac. 936], witnesses to the good disposition of defendant were permitted to be asked if they had heard of his prior conviction of murder and of his having drawn his pistol on different persons. The supreme court said: "In the cross-examination of witnesses testifying to reputation or character, such questions are permissible."

In *People* v. *Moran*, 144 Cal. 62, [77 Pac. 783], on cross-examination of a witness who had testified to defendant's good reputation for peace and quiet, it was held proper to ask if he had not read that within eighteen months defendant had been arrested for disturbing the peace—the court, through the chief justice, stating that it was strictly in line of cross-examination, and that "The cases cited by counsel to the proposition that it was misconduct in the prosecuting attorney to ask about the arrest for vagrancy do not sustain him,

the one nearest in point—*People* v. *Crandall,* 125 Cal. 134, [57 Pac. 785]—being distinctly against him.''

In *People* v. *Perry,* 144 Cal. 750, [78 Pac. 284], the questions on cross-examination whether the witnesses had heard that the defendant was charged with burglary and convicted of petit larceny were held admissible, the court quoting from *People* v. *Gordon,* 103 Cal. 574, [37 Pac. 535], to the effect that the opinion of the witness and the value of it ''may be tested by asking him whether he has ever heard that the person in question has been accused of doing acts wholly inconsistent with the character which he has attributed to him.'' (See, also, *People* v. *Weber,* 149 Cal. 342, [86 Pac. 671].)

Assuming that the question as to the indictment by the grand jury of Lake county was improper, it is sufficient to say that this is not a case where the mere asking of such a question should be held to require a reversal of the judgment. Counsel for appellant manifest a good deal of heat over the contention that the district attorney was not asking these questions in good faith. But how would counsel have the question of good faith determined? They did not ask the district attorney whether he was acting in good faith or whether he had any ground for believing that the witnesses had heard unfavorable reports concerning the conduct of appellant. And if he had volunteered such information in the presence of the jury, it is clear that it would have been palpable error. The fact is that, under the circumstances, we must assume that he was conscientiously discharging his duty as he understood it, and we can see nothing in his conduct in the examination of witnesses that was prejudicial to any substantial right of appellant. Besides, the answers to the questions were unfavorable to the prosecution, and therefore appellant suffered no harm. (*People* v. *Chin Hane,* 108 Cal. 604, [41 Pac. 697].)

The court did not abuse its discretion in limiting the number of character witnesses to thirteen. No evidence was offered by the prosecution to impeach that reputation and, as stated in *Bunnell* v. *Butler,* 23 Conn. 68: ''There must necessarily be a limit to such inquiries, and it is for the court to prescribe it.'' (*People* v. *Moan,* 65 Cal. 532, [4 Pac. 545]; *People* v. *Casselman,* 10 Cal. App. 241, [101 Pac. 693].) It is not at all likely that any additional witness would have added to the

force of the testimony of the large number testifying, none of whom was impeached or contradicted.

Miss Smith had testified on direct examination that she had sexual intercourse with appellant for the first time at Oakland, in June, 1906. On cross-examination impeachment was sought by showing that, before the grand jury, she had testified that in April, 1906, at the sanitarium, appellant "did things that no physician should do with a patient." On redirect, she was allowed, over the objection of appellant, to answer the question: "What were those things?" The question was equivalent to an inquiry for an explanation of her statement. It would certainly be a very harsh and unjust rule that would close the mouth of a witness under such circumstances, where an answer is capable of a construction either consistent or inconsistent with his other statements under oath. The law, on the contrary, indulges the presumption that a witness is speaking the truth, and affords him every reasonable opportunity to support that presumption and to appear in the proper light before the jury. On redirect examination it is proper for him to state facts and circumstances that tend to correct or repel any wrong impressions or inferences that arise from a matter drawn out on cross-examination, notwithstanding such facts and circumstances may prejudice the case for the defendant. (*People* v. *Corey*, 8 Cal. App. 725, [97 Pac. 907].)

We need not consider the contention of respondent that "the testimony would have been admissible on direct examination as showing the relation of the parties, and on the question of motive and as to the parentage of the child," as there can be no doubt that it was admissible in view of the cross-examination.

It is claimed that the court erred in excluding testimony as to the purpose and motive in making the trip to Bills mine. This is, of course, an important consideration, and relates to the time when the dynamite was secured. The rule, no doubt, is that "When the act of a party may be given in evidence, his declarations made at the time, and calculated to elucidate and explain the character and quality of the act, and so connected with it as to constitute one transaction, and so as to derive credit from the act itself are admissible in evidence (*Lund* v. *Inhabitants of Tyngsborough*, 9 Cush. (Mass.) 36).

. . . The existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact as his own testimony that he then had that intention would be." (*Mutual Life Ins Co.* v. *Hillman,* 145 U. S. 285, [36 L. Ed. 706, 12 Sup. Ct. Rep. 909] ; *Rogers* v. *Manhattan Life Ins. Co.,* 138 Cal. 290, [71 Pac. 348].) In harmony with this rule the court allowed the greatest latitude to the appellant in showing what was said and done at the mine at the time he secured the dynamite. The court properly excluded evidence as to conversations between appellant and other parties that occurred days before the said visit to the mine. These conversations were no part of the *res gestae* and were clearly hearsay. As stated in *Aguirre* v. *Alexander,* 58 Cal. 26, the verbal declarations of a party to be admissible must accompany the act, the nature, object or motive of which is the subject of inquiry; they must be *contemporaneous* with the act to which they were intended to give character. *People* v. *Huntington,* 8 Cal. App. 612, [97 Pac. 760), is a case directly in point. Therein it was stated by the court, through Presiding Justice Cooper, that "The law would not permit a party who intended to perform an act that was criminal to make statements or declarations a day or two before the act, as to the lawful purpose in mind, and then introduce such declarations to justify himself." They are classed as self-serving declarations, and it is well settled that they are not admissible. (*Barkly* v. *Copeland,* 86 Cal. 489, [25 Pac. 1, 405].)

The court permitted evidence that one Marian Derig gave money to Lu Smith to induce her to depart from the state prior to the trial. The theory of the prosecution was that the said Derig was acting in behalf of defendant. Upon this theory alone could the evidence be properly received. To establish the co-operation, the people relied upon circumstantial evidence. Of course, it would be rare that any direct evidence could be afforded of the criminal connection in such a case. These are the circumstances which respondent urges as sufficient to justify or at least to render rational the inference that Marian Derig was acting as the agent of appellant: She had been a friend to the defendant for some time, having been a patient at his institution years before; after defendant

was charged with this crime she left her home in Los Angeles and came to the sanitarium under a fictitious name and remained there until shortly after Lu Smith departed. She went to the private residence of the defendant and did not register as guests usually do; though not a patient, she took part of her meals at her private rooms, especially during the last of her stay, when the negotiations with Lu Smith were begun; she and the defendant conferred in her private room and the housemaid was told to come back later; she stayed at the institution at his expense. After Lu Smith wrote the defendant requesting money to go to Japan, Marian Derig sought Lu Smith in Berkeley, where she was staying, and, during the pendency of the negotiations for the departure of Miss Smith, Marian Derig made trips to the sanitarium. Lu Smith had not seen nor corresponded with Marian Derig for four years prior to the commission of the offense; there was evidence that Marian Derig had no money of her own; there was no apparent reason why she should make a present of $750 to Miss Smith; there was evidence that Marian Derig fabricated a letter of exoneration of appellant, purporting to have been written by Lu Smith, which letter was offered by appellant at the trial for the consideration of the jury. It is insisted that it is a legal and, in fact, the only reasonable inference from these circumstances that the act of Marian Derig was authorized and directed by appellant, and with this contention we entirely agree. The evidence connecting appellant with the transaction is more persuasive than that imputing participation in a felonious conspiracy to defendant in the case of *People* v. *Donnelly,* 143 Cal. 394, [77 Pac. 177], and yet in that case a conviction of murder was upheld by the supreme court. As stated in Underhill on Evidence, section 491: ''It need not be shown that the parties actually came together and agreed in express terms to enter into and pursue a common design. The existence of the assent of minds which is involved in a conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from proof of facts and circumstances which, taken together, apparently indicate that they are merely parts of some complete whole.'' We feel no doubt that the court was justified in permitting the jury to consider the testimony with the following admonition which it gave: ''Unless you are satisfied from all the

evidence in the case that the defendant did cause or authorize the persuasion or disappearance of such witness, you cannot consider it as a circumstance against the defendant.''

Other instructive cases cited by respondent in this connection are: *Chicago etc.* v. *Collins,* 56 Ill. 212; *Clark* v. *State,* 28 Tex. App. 189, [19 Am. St. Rep. 817, 12 S. W. 729]; *Fisher* v. *State,* 73 Ga. 596; *Wilkerson* v. *State,* 73 Ga. 799; *People* v. *Pitcher,* 15 Mich. 396; *McDovell* v. *Russell,* 37 Pa. 169; *State* v. *Prater,* 52 W. Va. 132, [43 S. E. 233]; *Harmon* v. *State,* 5 Tex. App. 549; *People* v. *Fehrenbach,* 102 Cal. 396, [36 Pac. 678]; *People* v. *Smith,* 151 Cal. 625, [91 Pac. 511].

It is claimed that it was error for the court to allow the prosecution to impeach and attack the character of the said Marian Derig, who was not a witness in the case.   Appellant has placed a wrong construction upon the testimony.   The facts of which complaint is made were developed while the witness Pierce was upon the stand.   He was interrogated as to the movements and financial condition of said Marian Derig, which were material and relevant matters.   His opportunity to know the facts and his relation to her were legitimate considerations for the jury.   The substance of the testimony of Pierce to which objection is made is stated by respondent as follows: That he had lived with Marian Derig and had known her for four years; that she left Los Angeles in February on the train for San Francisco, and that she returned to Los Angeles about the 1st of May, stayed a short while and returned to San Francisco; that he had not seen her since, except once in October; that her maiden name was Summerville; that she had gone by his name for about four years; that he had known of her having no employment except demonstrating for him.   ''In weighing the testimony of witnesses a court or jury should, of course, take into consideration evidence disclosing their means of knowledge and relation to the parties and issues.''   (30 Am. & Eng. Ency. of Law, 1069.) ''The law regards as relevant all facts which tend to illustrate the credibility of the witness or which enable the jury to determine the weight of his testimony.''   (*People* v. *Saunders,* 13 Cal. App. 747, [110 Pac. 825].)   ''The life and associations of a witness, whether impeachable or the reverse, are all relevant.''   (Underhill on Criminal Evidence, sec. 244.)   Of course, the district attorney should not ask a wit-

ness a question merely for the purpose of degrading him or anyone connected with the case, but it cannot be said that we have an instance here of such misconduct.

Appellant seems to think that it was "most prejudicial error" on the part of the court in excluding evidence "of Lu Smith's illicit relations with other men and as to acts of lewdness on her part." The contention is made upon the ground that the issue was tendered by respondent. As to this appellant is in error. Besides, unless confined to the period of possible conception, the evidence was immaterial. This is not one of the methods recognized by the law for impeaching the credit or character of a witness. She was asked by the district attorney whether, during the months of May, June, July and August or September, 1908, she had the company of any other man than Doctor Burke, and she replied: "I did not or any other month." This latter part of the answer was manifestly not responsive to the question and should have been stricken out if a motion to that effect had been made. The purpose of the inquiry was clearly to eliminate the consideration of other than the defendant as the father of the child. On cross-examination, after testifying to the first act of intercourse with defendant, she was asked: "Up to that time had you never maintained any illicit relations with any man?" The district attorney objected to the question and the court erroneously overruled the objection. The error was in favor of appellant, but it did not preclude the court from ruling right and excluding further evidence as to the morality of the witness at a time long prior to the period already mentioned. The court stated that it would allow the defendant to show the relations of Lu Smith and any man at any time when such relation might have any bearing upon the question of the parentage of the child. That was as far as the court was required to go, and no evidence within that limitation was offered by appellant. "A witness cannot be impeached by evidence of particular wrongful acts, nor is it proper to question the witness with reference to such matters." (*Sharon* v. *Sharon*, 79 Cal. 673, [22 Pac. 26, 131]; *Barkly* v. *Copeland*, 86 Cal. 490, [25 Pac. 1, 405]; *Pyle* v. *Piercy*, 122 Cal. 386, [55 Pac. 141]; *Estate of James*, 124 Cal. 657, [57 Pac. 578, 1008]; Code Civ. Proc., sec. 2051.)

In *People* v. *Benson,* 6 Cal. 221, [65 Am. Dec. 506], cited by appellant, evidence of intercourse with other men is said to be admissible in that class of cases, as tending to disprove the allegation of force. Here the act was voluntary on the part of each. Of course, it is also apparent that evidence of the character sought to be introduced would have no tendency to decrease the probability that appellant was the father of the child. As stated by respondent, "It would not legitimately aid the defendant to show that she was a prostitute instead of a mistress."

The prosecution offered evidence to show that, after the offense was committed, an attempt was made to substitute other dynamite for that which it is claimed was exploded by appellant as charged in the indictment. The story is an interesting one, but we cannot enter fully into its details. Appellant testified, in his own behalf, that at the time of the explosion when Lu Smith was injured, he had in his possession the dynamite which he had secured at the mine in December preceding, and that it continued to remain on the premises. He also offered an explanation of his denial to the officers that he ever had any on the place. He produced in court what he claimed to be the original package of dynamite. It was therefore manifestly proper for the people, in rebuttal, to impeach the genuineness and integrity of this dynamite. The only possible legal objection to the district attorney's efforts to do so is found in the contention that appellant's connection with the transaction was not shown. In this respect the situation is similar to that existing in reference to Marian Derig as aforesaid. The undertaking to secure the additional dynamite originated with one Golden, and the question is whether he was the agent of appellant in the premises. As with Marian Derig, so with him, we think there was abundant evidence of his agency to authorize the ruling of the court. Appellant argues the point as though respondent relied upon the fact of Golden's employment as attorney for appellant to justify the inference of criminal agency, but we do not understand respondent to make any such absurd claim. Our attention is called to many facts and circumstances, which we deem it unnecessary to specify, that can leave little, if any, doubt in the unprejudiced mind

that there was concert and collusion between Golden and the defendant to fabricate this evidence, as claimed by the people.

The witness, B. F. Greenwell, was called by the prosecution, and, among other things, he testified that Golden asked him to find four sticks of dynamite and that Golden said he had destroyed evidence that was necessary to keep the doctor from the penitentiary. Over the objection of appellant, the witness was asked if he had not told certain parties that Golden said "he had destroyed that dynamite, which was the only evidence that would save the defendant from the penitentiary." The ruling of the court was proper, under the authorities. (*People* v. *De Witt,* 68 Cal. 586, [10 Pac. 212]; *People* v. *Cook,* 148 Cal. 344, [83 Pac. 43]; *Zipperlen* v. *Southern Pac. R. Co.,* 7 Cal. App. 217, [93 Pac. 1049].) But at any rate, the ruling was without prejudice, since the answer was favorable to appellant and no impeaching evidence was offered by the people. (*People* v. *Chrisman,* 135 Cal. 287, [67 Pac. 136].)

During the progress of the trial Miss Smith, while on the stand one day, held her baby in her arms, and she was asked by the district attorney whether that was the child that she referred to in her testimony, and she answered in the affirmative. It is claimed that it was "gross error for the district attorney to bring in Lu Smith's illegitimate child and exhibit it to the jury." We know of no rule that precludes a woman from bringing into the courtroom her own child, whether legitimate or otherwise, and as to the said questions asked of the witness, it would be sufficient to say that no objection was made until they were answered. But in view of the question as to the paternity of the child, it was altogether proper to exhibit it to the jury that they might observe the resemblance, if any, to the putative father. "Taken by itself, proof of such resemblance would be insufficient to establish paternity; but it would be clearly a circumstance to be considered in connection with other facts tending to prove the issue on which the jury are to pass." (*Grant* v. *State,* 50 N. J. L. 490, [14 Atl. 600]; *In re Jessup,* 81 Cal. 417, [6 L. R. A. 594, 21 Pac. 976, 22 Pac. 742, 1028].) The later decisions hold such evidence admissible. In the second Biennial Supplement to Encyclopedia of Evidence, page 195, it is said: "Family resemblance being nature's own identification is so

common and well known that there is no practical reason why the alleged offspring should not be exhibited to the jury in any case. . . . The jury are the best judges on the question of similarity, and, unless it exists, a production of the offspring would be in the defendant's favor." (See, also, *People* v. *Richardson,* 161 Cal. 552, [120 Pac. 20].)

It is equally clear that the court did not err in rejecting testimony of appellant's generous disposition. The rule is well settled that incidental and remote traits of character are not involved. (*People* v. *Fair,* 43 Cal. 137.) The court was quite liberal in allowing character evidence, but it could not, with any degree of propriety, enter upon an exploration of this illimitable field of remote and speculative inquiry.

We are satisfied also that the court did not improperly restrict the cross-examination as to the mental condition of Lu Smith. Appellant complains that he was not permitted to show that at times she labored under delusions and hallucinations. But it is pointed out by respondent that she was cross-examined for over two days as to every phase of her life and covering a period of over thirty years. There was no denial of defendant's right to the broadest inquiry of witnesses as to Lu Smith's sanity. He was not precluded from showing any acts or declarations of hers that would indicate mental unsoundness, and it is admitted that the opinions of witnesses upon the question were received together with the statement of the facts upon which they based their conclusions. The particular questions of which complaint is made were clearly not proper cross-examination, and it is at least doubtful whether they called for material testimony. The peculiar hallucination related to her belief that a certain professor in the university was in love with her and it was argued that she was under a similar delusion as to defendant. The pertinency of the testimony is hardly apparent. But at any rate, the professor was called by defendant and an objection of the district attorney was sustained to this question: "Were your relations ever anything other than that of instructor and student?" The matter is too inconsequential for further comment, but it is sufficient to say that the objection was sustained with "leave to offer the testimony later on." Of this privilege, however, appellant failed to avail himself.

18 Cal. App.—7.

It is earnestly contended that prejudicial error was committed by the court in permitting testimony of other crimes of appellant. Of the thirteen specifications, eight relate to matters concerning which the character witnesses for defendant were cross-examined. These we have sufficiently considered. Of the others one relates to the illicit relations with Lu Smith and the parentage of the child, one to subornation of perjury and preparation of false evidence, one to the inducement offered a witness to leave the state, one to lewd and lascivious conduct with the prosecuting witness, and the other to an attempt to poison her in the treatment of the injury she received at the time of the explosion of the dynamite. Evidence of the parentage of the child was clearly admissible as bearing upon the ·subject of motive. It is elementary that efforts to manufacture testimony or to induce adverse witnesses to leave the jurisdiction of the court is properly received as indicating a consciousness of guilt. The lewd and lascivious conduct was a circumstance naturally and logically connected with its expected and ordinary culmination to which we have referred. Appellant having been charged in the indictment with an intent to injure Lu Smith, a subsequent attempt on his part to take her life would be admissible to identify him as the one committing the original act. Besides, in another view, it would be properly received as an effort to destroy an important witness against appellant. It clearly does not come under the operation of the general rule that precludes evidence of one crime upon the trial of a charge for another.

It is held by all the authorities that, whenever there is a clear connection between two offenses, from which it may be logically inferred that, if guilty of one, the defendant is also guilty of the other, evidence of such other offense is admissible. (*People* v. *Craig,* 111 Cal. 460, [44 Pac. 186]; *People* v. *Sanders,* 114 Cal. 216, [46 Pac. 153]; *People* v. *Wilson,* 117 Cal. 691, [49 Pac. 1054]; *People* v. *Valliere,* 123 Cal. 576, [56 Pac. 433]; *People* v. *Cook,* 148 Cal. 341, [83 Pac. 43]; *People* v. *Zimmerman,* 3 Cal. App. 87, [84 Pac. 446]; *People* v. *Crowley,* 13 Cal. App. 524, [109 Pac. 493]; *People* v. *Arberry,* 13 Cal. App. 751, [114 Pac. 411].)

The court did not err in declining to direct the district attorney to deliver to counsel for appellant a statement reduced

to writing of Lu Smith in order that it might be used in the cross-examination of Sheriff Smith. He was not interrogated concerning it in his direct examination and only incidentally referred to it in his statement of a conversation with appellant to which the question by the district attorney was addressed. The statement of Lu Smith was an entirely separate and distinct matter. There is no evidence that the sheriff had ever seen the written statement nor did he attempt to give its contents. He was permitted, however, on cross-examination to declare that he referred to her statement that Dr. Burke was the father of the child. Anything else in the writing was entirely beyond the legitimate scope of cross-examination. If it could be used at all, it would only be for the purpose of impeaching Lu Smith on some material matter, but it was not demanded in connection with her examination. (*People* v. *Glaze*, 139 Cal. 158, [72 Pac. 965].)

But even if it did not appear that it was not proper cross-examination, the refusal of the court to order the paper produced could not be held prejudicial error, as the record does not show the contents of the said statement. (*People* **v.** *Ruef*, 14 Cal. App. 583, [114 Pac. 57].)

We are satisfied the court did not unduly restrict the cross-examination of witness Dillard. Indeed, the court seems to have been quite indulgent in the matter of the examination of witnesses. The cross-examination of this particular witness covers over one hundred pages of the transcript. The principal complaint in this connection, however, is directed to the court's ruling sustaining the district attorney's objection to the offer by appellant to introduce in evidence a certain letter written by the witness. We deem it unnecessary to set out the letter. It is manifest that portions of it are entirely immaterial. The material part of it, if any, could be properly received only to impeach the witness, and, in order to lay the basis for its introduction the witness must have been interrogated concerning it. Appellant appears not to have pursued the course that the law requires, and he cannot now complain of the court's action.

Appellant contends that "the court erred in excluding evidence of defendant's whereabouts on night of explosion." We find no error in this respect. The defendant testified fully as to where he was; and neither he nor any other wit-

ness was precluded from testifying to any relevant fact in the attempt to establish an alibi. The court properly sustained an objection to certain questions calling for the conclusion or opinion of the witness, but there was no invasion of the right of appellant to the fullest inquiry as to all pertinent facts. The declarations of appellant as to where he had been and whither he was going constituted hearsay, and could be admissible only upon the theory that they were a part of the *res gestae*. The *res gestae* here must be directly connected with the explosion of the dynamite which caused the injury to the prosecuting witness. Declarations made at a different place and at a different time neither in law, logic nor in fact can be considered a part of said transaction. The subject is of elementary cognizance and need not be discussed. *People* v. *Kalkman,* 72 Cal. 212, [13 Pac. 500], is directly in point. (See, also, *People* v. *Chin Hane,* 108 Cal. 604, [41 Pac. 697]; *People* v. *Prather,* 120 Cal. 664, [53 Pac. 259]; *People* v. *Huntington,* 8 Cal. App. 621, [97 Pac. 760].)

R. A. Grigsby, a witness for defendant, qualified as a mining engineer, and, after describing the appearance of the rocks in the ditch hereinbefore referred to, he was asked the question: ''From your experience as an engineer, what would be the most practical way to remove those rocks?'' There was no error in the court's ruling that this was not a matter of expert testimony, that the witness was ''in no better position as to that than these jurors, whether it required a crowbar or dynamite, or whether it required black powder, or what it might require.'' It may be said that appellant's witnesses were permitted to fully explain the situation as to the rocks so that there would and could be no doubt concerning the only feasible method of getting rid of them.

On the ground that it called for the conclusion of the witness,. the court sustained an objection to the question asked of a Mr. Hedge: ''Was there any secrecy about Dr. Burke's statements or movements or his actions in connection with the getting of that powder, Mr. Hedge?'' Appellant was permitted the fullest latitude in showing his manner and conduct at the mine when he obtained the dynamite. What he said was also admitted in evidence. In fact, there was no showing of any secrecy in connection with his actions there, and it was not contended by the prosecution that there was

anything clandestine or mysterious about his movements at
the mine. Hence the ruling could not have been prejudicial
if erroneous. But it is clear that the question called for an
inference within the exclusive province of the jury, and the
court was right in so holding.

If there had been any contention or evidence to the con-
trary there might be some ground for the claim that the court
erred in sustaining an objection to the question: "Did Dr.
Burke say anything to you or to any person there at any
time while he was there, asking you not to tell about giving
the powder?" But as already appears, this would not have
been in rebuttal of anything introduced by the people. Be-
sides, evidence of the declarations of appellant "at any time"
while at the mine would not be admissible. At most, his state-
ments made at the time he procured the dynamite could prop-
erly be and it may be said they were received in evidence.

The district attorney's closing argument is made the sub-
ject of animadversion by appellant. It is declared that he
"threw aside all discretion and all pretense of fairness and
loudly declared to the jury in substance and effect that the
people of the state of California had already found the de-
fendant guilty and further threatened that the citizens of
the state were watching and that the jury would not dare
to do anything but so declare by their verdict." It is as-
serted that "the books do not record a more flagrant instance
of gross violation of a defendant's rights, or more far-reach-
ing in its prejudicial effect." It is apparent, though, that
appellant, in characterizing and condemning the utterances of
the district attorney, has manifested far more heat than did
that officer, in his address to the jury. Here is what he said:
"Let us have a law that is equal for rich and poor, for those
in high estate and those in low estate, and a law like that if
so administered will enjoy the confidence, deserve the rever-
ence and support of the people of our state. To-night the
people of our state look here to you. They are not looking
here—those who are familiar with the facts of the case—to find
out whether or not the defendant is guilty. They have con-
ceded that he is. They are looking here to find out if a court
of justice is going to declare him so." An exception was
taken to the statements and the court said: "That statement
as to what the public or other people think about it is to be

disregarded by the jury. It is not proper matter for their consideration at all.'' The first part of the above extract from the address sounds like a quotation from the Declaration of Independence and the latter part means simply that the people who are familiar with the facts of the case have already conceded that the defendant is guilty and they expect justice to be meted out to him. It contains nothing like a threat, and it could be considered by the jury only as an expression of the opinion of the district attorney that the facts of the case were sufficient to convince anyone of the guilt of defendant. The whole argument of the district attorney necessarily implied that he believed the defendant to be guilty, and that any fair-minded man familiar with the facts must reach the same conclusion. Of course, as held in many decisions, the range of discussion, illustration and argumentation of counsel is very wide; matters of common knowledge and historical facts may be referred to and interwoven in the argument, and allusion may be made to the prevalence of crime and the duty of the jury. (*People* v. *Molina,* 126 Cal. 507, [59 Pac. 34] ; *People* v. *Glaze,* 139 Cal. 159, [72 Pac. 965] ; *People* v. *Soeder,* 150 Cal. 12, [87 Pac. 1016] ; *People* v. *Craig,* 152 Cal. 50, [91 Pac. 997] ; *People* v. *McRoberts,* 1 Cal. App. 25, [81 Pac. 734] ; *People* v. *Ye Foo,* 4 Cal. App. 740, [89 Pac. 450] ; *People* v. *Amer,* 8 Cal. App. 139, [96 Pac. 401] ; *People* v. *Ruef,* 14 Cal. App. 583, [114 Pac. 57].)

But if the remarks should be considered improper, we must presume that any injurious effect was forestalled or removed by the direction of the court. (*People* v. *Putnam,* 129 Cal. 262, [61 Pac. 961] ; *People* v. *Benc,* 130 Cal. 165, [62 Pac. 404] ; *People* v. *Shears,* 133 Cal. 159, [65 Pac. 295].)

Manifestly, some allowance must be made for the zeal of attorneys and some confidence reposed in the intelligence and fairness of the jury, and it may be said, generally, that every statement of the district attorney criticised by appellant is less objectionable than what has been held by the supreme court to be insufficient to warrant a reversal of the judgment.

There is a controversy between counsel as to whether the ''substituted'' dynamite was received in evidence, the contention of the district attorney being that it was, while, on the other side it is insisted that it was a piece of metal

connected with it rather than the dynamite itself which was introduced. The matter is too trivial for extended consideration, but there can be no doubt that such dynamite was exhibited to the jury by appellant, and, therefore, it became the subject of legitimate argument. Moreover, it is a fair inference from the record that it was actually received in evidence.

We find no error of the court in giving or refusing proposed instructions. One of the directions to the jury to which exception is taken is the following: "Therefore, if you are satisfied from the evidence in the case beyond a reasonable doubt and to a moral certainty that the crime charged in the indictment was directly committed by the defendant, as therein set forth, it would be your duty to find him guilty. So, too, if you should be likewise satisfied from the evidence in the case that the explosive referred to in said indictment was deposited and exploded by some other person than the defendant, whose identity is unknown, and you should be also satisfied from the evidence beyond a reasonable doubt that the defendant was concerned in the commission of such crime, as above explained, but that he did not directly commit the act constituting the offense, but aided and abetted in its commission, or not being present, advised and encouraged its commission, you should likewise return a verdict of guilty." The contention of appellant was expressed in the following proposed instruction which was refused by the court: "There is no evidence showing or tending to show that the defendant caused or procured any other person to deposit or explode such explosives. Therefore, if you believe from the evidence that the defendant did not personally at the time and place alleged in the indictment, deposit and explode the explosive as in said indictment alleged, you must acquit him." In his brief appellant goes a little further and contends that "if the evidence does not show who committed the act, the defendant should have been acquitted." We think appellant has taken an entirely erroneous view of the situation. In the first place, from the evidence introduced by the prosecution, it would be a fair inference either that the defendant personally exploded the dynamite or that it was done by someone else with his knowledge and cooperation. Hence, appellant's proposed instruction was prop-

erly refused. But it cannot be the law under our practice that a defendant must necessarily be acquitted of the crime charged, for the reason that it may be uncertain as to who committed the final act. Of course, it must be shown that the crime was actually committed. Of this there could be no doubt in the case at bar. And, since he can be charged in the indictment as a principal whether he actually committed the offense or aided and abetted or encouraged its commission, he can be justly convicted if the evidence shows that he was connected with the crime in either relation. The district attorney is not required to elect whether he will prosecute or ask for a conviction upon the ground that the defendant was the principal or an accessory before the fact, but he may ask for a verdict if the evidence satisfies the jury of either alternative. It appears to follow that the additional burden is not cast upon the people to identify someone else as having guilty connection with the crime. The rule seems to be correctly stated by the supreme court of Colorado, in *Goldberger* v. *People,* 45 Colo. 335, [101 Pac. 409]. There, on a charge of arson, a similar instruction was given by the lower court, and in the opinion it is said: "We are unable to see how a more succinct and accurate statement of the facts and circumstances necessary for the jury to find in order to warrant a verdict of guilty could well have been formulated. The information charges the defendant Goldberger directly and personally with the offense of arson. The state was not committed by this charge to any one theory or to any single line of proof as is contended for defendant by his attorney. If upon the whole testimony adduced the jury could find, beyond a reasonable doubt, that Goldberger, either personally or in conjunction with any other person or persons whomsoever, feloniously burned the buildings, or if it could find that he, by aiding, advising or abetting any other person or persons whomsoever, procured the felonious, willful and malicious burning of them, or either of them, then he was guilty, and it was the sole province of the jury, upon all the testimony, to determine that precise question. This instruction is clearly right, under the peculiar circumstances here shown. There was testimony to support, and the jury was warranted in returning a verdict of guilty, upon the theory that the defendant personally

set out the fire, or upon the theory that he conspired with Hathaway and so procured it to be set out, or that the defendant Hathaway and the witness Freund combined together to perpetrate the offense, or that he and Freund were the guilty co-conspirators. It would indeed be a novel doctrine if, under these conditions, the defendant by motion could have compelled the state to elect upon which theory it would proceed. Under our practice and the charge made, in view of the circumstances of this case as disclosed by the testimony, the state had a right to an instruction, which permitted the jury, upon all of the evidence, to determine the ultimate fact of guilt, without a limitation confining it to a consideration of any specific theory or aspect of the case." We do not see how any other sensible view can be taken of the subject, and we feel satisfied that in this respect there was no violation here of any legal principle. In *People* v. *Schoedde,* 126 Cal. 373, [58 Pac. 859], cited by appellant, it was decided that the principle which we have stated is sound, but it was held that it had no application, the supreme court stating that "under the evidence there is not disclosed that aiding and abetting by defendant which would make him a principal in the crime."

All proper instructions requested by appellant were either given or included in the charge of the court. No fact was assumed against appellant, and every principle of law necessary for the proper understanding of the case was set forth in apt terms. An examination of the charge is a sufficient refutation of the criticism of appellant, and we deem further specific notice unnecessary.

Counsel for appellant have severely criticised the conduct of the trial and they have unsparingly denounced the attitude of the district attorney and of the trial judge. They seem to think that the constitutional rights of the defendant were ruthlessly trampled under foot, and that he was "hurried against the law and the evidence" to an unwarranted conviction. It was even asserted in oral argument that scarcely any case could be found furnishing a more striking illustration of unfair treatment accorded to a defendant. The intemperate language of counsel is surprising, and it is not justified by the record. It simply illustrates, however, the partisanship and zeal for a client's cause that often unwit-

tingly lead able and upright advocates to indulge in extravagant utterances and to assume positions that cannot be sustained. After an earnest consideration of the case we are unable to find evidence of any disposition on the part of the district attorney or of the trial judge to violate any of the rights of the accused. The representative of the people, it is true, conducted the prosecution with a good deal of vigor. Without it, however, he could not hope to prevail against the alert, aggressive and able counsel for appellant who stubbornly contested every inch of the way. His good faith was aspersed, his witnesses were impugned and his contentions ridiculed, and it is not surprising that he at times manifested some degree of asperity, but upon the whole his conduct of the case was admirable, and it cannot fairly be said that he departed in any substantial respect from the strict line of his duty. The intensity of the struggle and the persistence of counsel, it may be said also, tried the patience of the trial judge, but he presided with that decorum and unfailing sense of justice that should characterize an important judicial officer. Little that he said during the long trial calls for criticism or invites retraction, and nothing could have prejudiced the interests of defendant. In what we have stated we intend nothing in derogation of the character, ability or sincerity of counsel for defendant, but, as we understand it, most of their contentions merit scant attention and none of them should prevail to overthrow the verdict of the jury.

In a word, appellant was fairly tried and justly convicted. The record is unusually free from error, considering the length of the trial and the vehemence of the contest, and we are convinced that no appellate court would be justified in interfering with the judgment of the trial court. The judgment and order are, therefore, affirmed.

Hart, J., and Chipman, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 25, 1912.