[Civ. Nos. 15667, 15779.   Second Dist., Div. One.   July 22, 1947.]

BETTY ROSE, Respondent, v. RALPH M. TANDOWSKY, Appellant.

Zagon, Aaron & Sandler and Jacob Paull for Appellant.

Hahn, Ross & Goldstone for Respondent.

WHITE, J.—This is an appeal by defendant from a judgment decreeing him to be the father of the minor child of plaintiff and ordering him to pay $100 per month for the child's support.   Defendant also has appealed from an order allowing plaintiff additional counsel fees upon the appeal.   The two appeals have been consolidated and presented upon a single set of briefs.

The action was commenced in November, 1945, to establish paternity of a child born May 21, 1940.   Plaintiff testified that she first met the defendant, a physician practicing in Hollywood, in 1934; that in the year 1936, she commenced having sexual relations with the defendant at his office after business hours, and that their relations continued up to the time of the conception of the child in August, 1939; that she had no relations with any other man during this period.

According to plaintiff's testimony, upon discovering her pregnancy, it was decided by plaintiff and defendant that

she should go to San Francisco. The defendant visited her in San Francisco, was with her for three days, and gave her some money. Plaintiff returned to Los Angeles and the child was born in a Los Angeles hospital. At defendant's suggestion plaintiff went under the name of the husband who had divorced her some years before and stated for the birth certificate that such divorced husband was the father of the child. Defendant visited her in Los Angeles before the birth, and at the hospital, gave her money for her rent and money for her hospital bills. After the birth of the child defendant continued to visit plaintiff at her home several times a week, on Saturday afternoons, Wednesday afternoons, and sometimes in the evening. Defendant gave plaintiff $10 per week in cash until some time in 1942, when he commenced paying her by check. In May of 1945, plaintiff asked defendant for more money and the defendant offered to pay her $3,000 cash and $20 per week. In July of 1945, defendant stopped all payments.

The defendant denied that he ever had sexual intercourse with the plaintiff. He testified that until 1936, he saw the plaintiff only in the company of a Mr. Lippman. The first visit of plaintiff to defendant's office was in 1936, in the company of Mr. Lippman, for the purpose of determining whether plaintiff was pregnant. From 1936 to 1939, defendant saw the plaintiff only when making professional visits to her home to treat her mother, or when plaintiff was in the company of Mr. Lippman. In the summer of 1939, plaintiff came to him for a pregnancy test, which was "positive," but she did not name the father. Defendant denied that he spent three days in San Francisco with plaintiff, stating that he went there on business, and met her there only once for lunch, in order to tell her about her mother's condition. He denied ever giving plaintiff any cash whatsoever; denied that he visited her at the hospital or paid her hospital bills, and testified that he did not see her after the San Francisco visit until April, 1941, when he was separated from his wife, and about that time he gave plaintiff a check for $10 to help her out on her rent; that in September of the same year he gave her a check for $60 to help finance a trip to New York. During the period from April to September, 1941, he visited her at her home and sometimes she visited at his home in company with others. Plaintiff worked in the defendant's office for a short period in the summer of 1941, and again

in the summer of 1942, for which she was paid by check. That about January, 1943, in response to plaintiff's demands, and in order to avoid a scandal, he commenced sending her $10 per week by check. In 1945, upon advice of counsel, he stopped the payments.

There was testimony corroborative of the plaintiff as to frequent visits by defendant at her home from August, 1940, to September, 1941 (the defendant denied seeing plaintiff after the San Francisco visit until April, 1941), and testimony by a "surprise" witness to an act of sexual intercourse between plaintiff and defendant, at the home of the witness, in 1938. The defendant introduced evidence supporting his testimony that the San Francisco trip was primarily a business trip; records of the building in which he had his office in contradiction of plaintiff's testimony that they met there after business hours; testimony by an employee of Mr. Lippman to the effect that plaintiff continued her association with Lippman until the early part of 1938; and evidence of a pharmacist that Lippman and plaintiff consulted with him in reference to a pregnancy test in 1938.

The first assignment of error is that the trial court gave misleading and improper instructions. It is contended that the two following instructions were conflicting and led to confusion on the part of the jury:

"You are instructed that the mere possibility that some person other than Ralph M. Tandowsky might be the father of Robert Rose will not support a verdict for the defendant, and if you believe from a preponderance of all the evidence, the defendant, Ralph M. Tandowsky, is the father of the child, you must return a verdict in favor of Betty Rose, the plaintiff.

"You are instructed that the burden of proof has remained on the plaintiff throughout this trial, to prove that the defendant is the father of Robert Rose. Therefore, you will not find that the defendant is the father of Robert Rose unless you are satisfied by a preponderance of the evidence that the defendant had sexual intercourse with the plaintiff at the time when according to the usual laws of nature, the child was begotten, and that the plaintiff, Betty Rose, did not have sexual intercourse with any other man at the time when according to the usual laws of nature, the child was begotten."

It is urged that the first instruction above quoted had the effect of removing from the jury's consideration the issues

of plaintiff's relations, if any, with Mr. Lippman or with her former husband. This contention cannot be sustained. The two instructions, which followed one another, were not in conflict. By them the jury was advised to decide the case in accordance with the preponderance of the evidence. If the jury, from a preponderance of the evidence believed that the defendant had sexual intercourse with the plaintiff at or about the time the child was begotten and did not have sexual intercourse with any other man, then it was to find that defendant was the father. The use of the words "mere possibility" certainly did not exclude from the jury's consideration either defendant's denial of intercourse or his contention that plaintiff continued to associate with Mr. Lippman. By excluding "mere possibility" the court did no more than direct the jury to confine its consideration to the evidence adduced and to avoid conjecture and speculation. While the burden of proof did not rest on defendant to prove that he was not the father, nevertheless, in his attempt to show that plaintiff had illicit relations with other men it was incumbent upon him to show that such relations were had at or about the time when, in the ordinary course of nature, the child must have been conceived. (*Berry* v. *Chaplin*, 74 Cal.App.2d 652, 662 [169 P.2d 442], and cases cited.) A "mere possibility" that some other man was the father could be said to exist in almost any conceivable case.

Although it would not appear at all likely that a jury could be confused or misled by the instructions quoted, appellant has presented the affidavits of three of the jurors in an attempt to show that at least two of them (two who voted for plaintiff) misunderstood the effect of the first instruction, in that, after hearing the instructions twice and obtaining permission to take the written instructions into the jury room, these two jurors concluded that by the first instruction above quoted they were foreclosed from all consideration of the alleged association of plaintiff with Mr. Lippman. Such an attempt at impeachment of the verdict by affidavits or statements of jurors cannot be considered except where the purpose is to show that the verdict was arrived at by chance. (Code Civ. Proc., § 657, sub. 2; *Phipps* v. *Patterson*, 27 Cal.App.2d 545, 546 [81 P.2d 437], and cases there cited.)

The court also instructed the jury that "if you find from a preponderance of the evidence that the defendant . . .

is the father ... you will so find by your verdict. This means that it is not necessary for the plaintiff to establish this fact beyond all reasonable doubt or to a moral certainty, but only by such evidence as when weighed with that opposed to it has more convincing force and from which it results that the greater probability of truth lies therein.'' Appellant urges that this is a ''formula'' instruction, that it is in part surplusage because covered by previous instructions, and that it gave ''undue prominence'' to the plaintiff's contention that defendant was the father of the child. These contentions afford no ground for reversal. Mere repetition of instructions, alone, is not reversible error. (*Grillich* v. *Weinshenk,* 64 Cal.App. 474 [222 P. 160].) The instruction merely stated the issue and defined, in approved language, the difference between a ''preponderance of the evidence,'' as required in a civil case, and ''reasonable doubt,'' as applied to a criminal action.

Appellant requested an instruction on the unreliability of evidence of physical resemblance. This instruction was refused. *In re Jessup's Estate,* 81 Cal. 408 [21 P. 976, 22 P. 742, 1028, 6 L.R.A. 594], cited by appellant, involved a question of photographs, and the court merely said, in the course of its decision that ''profert of the persons themselves ... would not go far toward establishing relationship.'' In *People* v. *Burke,* 18 Cal.App. 72 [122 P. 435], it was said that while proof of resemblance alone would be insufficient to establish paternity, ''it would be clearly a circumstance to be considered in connection with other facts. . . . The jury are the best judges on the question of similarity, and unless it exists, a production of the offspring would be in the defendant's favor. . . .''

The defendant requested the court to instruct the jury specifically with reference to the enmity between the ''surprise'' witness and defendant as affecting the credibility of such witness, and also the giving of an instruction to the effect that the charge made by plaintiff ''is one which is easy to make and difficult to disprove'' and that plaintiff's testimony ''ought to be received with great care and caution, and the evidence in this case should be weighed with the utmost care without bias or prejudice.'' These two instructions were properly refused, because the jury was properly instructed in other instructions upon the credibility of witnesses and neither party is entitled to have instructions as to the credibility of particular witnesses. The refusal of other instruc-

tions requested by defendant, relating to a definition of adultery, legal penalties for offering false instruments for recording, and presumptions of innocence, cannot be considered as prejudicial error, under the circumstances here presented, and in view of the instructions actually given. A review of the entire charge convinces this court that while the jury was given a minimum of instructions, those given were clear and adequate for a proper determination of the issues presented.

Appellant next seeks to ground prejudicial error upon the court's refusal to grant a continuance for the purpose of allowing defendant to secure and introduce evidence to impeach the witness who testified to an act of intercourse between the parties in 1938, and whose testimony, it was claimed, came as a surprise to defendant and his attorney. In an effort to impeach this witness, the defendant was permitted to introduce testimony of the ill-will existing between himself and the witness, the existence of which state of mind on his part was admitted by the witness. As grounds for a continuance defendant urged that he desired to secure from the military authorities at Washington records to show that the witness had suffered a court-martial conviction, the record of which, he claimed, would show that the witness was mentally afflicted and that his addiction to the use of morphine was indicated. However, the manifest purpose for the requested continuance was not to secure evidence in contradiction of the testimony given by the "surprise" witness, but merely to secure cumulative evidence of an impeaching character. "It is the rule that a continuance is properly refused if the testimony of the absent witness would only tend to impeach a witness of the adverse party." (12 Am.Jur. 468. See, also, 13 C.J. 154; 17 C.J.S. 229.) Moreover, the admissibility of such impeaching evidence was, to say the least, extremely doubtful. Defendant sought to prove, not the conviction of a felony, but the conviction of a military offense for which the witness was sentenced to 12 months' imprisonment, but placed on probation. In such circumstances, no abuse of discretion on the part of the trial court appears.

The next question presented is whether the court committed prejudicial error in limiting the scope and degree of the cross-examination of plaintiff. Appellant urges that the scope of plaintiff's direct testimony largely determined the proper scope of cross-examination, and in this connection directs attention to the testimony of plaintiff that she met

defendant in 1934, while attending a party at defendant's home, and met him under similar circumstances frequently thereafter; that their sexual relations commenced in 1936, and continued until 1942, and that she had no relations with any other man after commencing relations with the defendant; that on cross-examination it was brought out that at these first meetings with defendant prior to 1936, she was escorted by Mr. Lippman, but that she last saw Mr. Lippman in 1935. The defendant asserted that they first met in 1932; that she continued to associate with Lippman until 1939, and that in 1936, and in 1938, pregnancy tests were performed on plaintiff at Lippman's request. The court struck the testimony as to the pregnancy tests. Defendant, while cross-examining plaintiff, offered to prove that from 1932 to 1939 or 1940, plaintiff was Lippman's mistress and that "a continuous series of sexual indulgences took place between the plaintiff and Lippman over this entire period of years, so that it may be presumed, unless rebutted by competent evidence, that those things having been shown to exist may be presumed to have continued to exist into the period of gestation," upon which the court ruled: "The offer is rejected and testimony is restricted to within one year of the period of May 21, 1940." However, the court then said: "I will amend the previous ruling of 1936 by way of cross-examining, by way of cross-examination, the witness having testified to the fact she had no relations with anyone but the doctor. It is purely cross-examination, but as to the paternity of the child, the court will permit only from May 21, 1939. MR. ZAGON (Counsel for defendant): And may we go into the testimony of the plaintiff on her direct that there was no other man in her life but Dr. Tandowsky since 1936 on? THE COURT: 1936, yes."

From the foregoing it is plain, and it appears from a reading of the transcript, that the cross-examination of plaintiff was not unduly restricted, but that on the contrary, the defendant was permitted to go into all matters testified to by plaintiff from the time, according to her testimony, she first commenced relations with defendant in 1936, up to and after the birth of the child. Appellant, however, assigns error in the striking of testimony given by defendant as to a pregnancy test made in 1936, at the request of Mr. Lippman. This error, if it was an error, was so unsubstantial as to afford no ground for reversal. The defendant was permitted to testify, in contradiction of plaintiff, that her first visit to

him in 1936, was not for treatment of a cold. Testimony by a pharmacist was admitted on behalf of defendant in support of defendant's contention that plaintiff's visits to him in 1937 and 1938, were in the company of her mother or Mr. Lippman, and that he, the pharmacist, had a conversation with Lippman, relative to "fixing up" the plaintiff. Aside from this one restriction, the defendant was allowed the widest possible latitude in his testimony concerning the entire period covered by the testimony of plaintiff.

It is next asserted that the conduct of plaintiff's counsel during the trial "was highly improper and prejudicial to the defendant." Excerpts from the reporter's transcript indicate that on several occasions plaintiff's counsel asked her questions such as, "Who is the father of the child? Did he give you any money for the support of the child?" and other questions implying that the money paid by defendant was for the support of the child, to which objections were made that such questions assumed facts not in evidence. Under the same heading appellant asserts that counsel sought to influence the jury, which was to try the issue of paternity only, by references to the substantial income of the defendant. The alleged misconduct was not such as to warrant a reversal or new trial.

The second appeal with which we are here concerned relates to the allowance of counsel fees to plaintiff and respondent in connection with defendant's appeal from the judgment. It was stipulated that the sum of $750 was a proper allowance for fees and costs in connection with the trial of the cause. It is contended by appellant that the sum of $750 allowed for services in representing respondent upon this appeal is excessive; that if $750 is adequate for the work involved in preparing for trial, taking depositions, and engaging in a four-day trial, then a similar amount for defending upon appeal is excessive, as the amount of work and time involved on appeal is "substantially less" than that consumed prior to the appeal. No authorities are cited by appellant as to what would be a reasonable fee for work upon an appeal in circumstances similar to those here presented. The measure by which attorney's fees are to be gauged in cases such as the one before us is (1) defendant's financial ability to pay, and (2) the character and amount of services rendered. (*Andrade* v. *Newhouse*, 54 Cal.App.2d 339, 346 [128 P.2d 927]; *Kyne* v. *Kyne*, 38 Cal.App.2d 122 [100 P.2d 806].)

It was shown that defendant's income was $800 per month net after payment of income taxes, and that he possessed $14,000 in bonds. It also appeared that he was paying $100 per month for the support of his son and was contributing to the support of his parents. It cannot be held, under the circumstances presented, that the allowance of fees on appeal is excessive. If the allowance is reasonable, considering the work to be done and the defendant's ability to pay, it may not be set aside solely because it equals or exceeds the amount awarded for preparation and trial of the action. In view of the lengthy trial, the questions raised on appeal, and the work involved in the preparation and presentation of respondent's case, we cannot hold that in making the award of attorney's fees here in question the court abused the wide latitude and discretion vested in it as to matters of this character. (*Andrade* v. *Newhouse, supra.*)

The judgment and the order allowing attorney's fees on appeal are, and each is, affirmed.

York, P. J., and Doran, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 18, 1947.