Filed 1/15/15  P. v. Oeun CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B250004 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA073193) |
| v. | |
| KENTON OEUN, | |
| Defendant and Appellant. | |

Appeal from the Superior Court of Los Angeles, Richard R. Romero, Judge. Affirmed.

Robert D. Bacon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A Taryle, Supervising Deputy Attorney General, Pamala C. Hamanaka, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant and appellant Kenton Oeun was charged, along with two others, with two counts of murder (Pen. Code, § 187, subd. (a)), one count of attempted premeditated murder (Pen. Code, § 664), and various special circumstances and gang and firearm enhancements.[1]  In a 2010 trial, a jury convicted codefendant Ratanak David Kim on these (and other) counts, but was unable to reach verdicts as to Oeun and his other codefendant, Savoeun Soeur.[2]  In a retrial in May and June 2013, the jury found Oeun and Soeur guilty of two counts of first degree murder, and found all but one of the special allegations to be true.  Oeun appeals his convictions, alleging errors and resulting prejudice in the admission of evidence and instructions to the jury.  We affirm.

**Background**[3]

*The party*

On the evening of January 20, 2007, Sowalnut Pov held a twenty-first birthday party for Mai Tran, his then-girlfriend.  Sowalnut and Tran lived in an apartment over the garage behind a front house on Downey Avenue in Long Beach.[4]  The party was marred by two shooting events.

*First shooting*

Kim was not an invited guest, but he arrived at the ongoing party with two women, one of whom was a neighbor from across the street.  Kim had prominent tattoos identifying him as an "Asian Boyz" gang member.  He introduced himself to Sowalnut as "Baby C," and asked if he could join the party.  Sowalnut said he could stay, obtaining his agreement that he would not invite others.  However, when Kim borrowed Sowalnut's

---

[1] Further code references are to the Penal Code, unless otherwise specified.

[2] Kim's conviction was affirmed in this court's unpublished decision (2d Civ. No. B230598), filed June 21, 2012.

[3] We omit some conflicting evidence and facts that are not germane to the appeal.

[4] To avoid confusion we identify the three Pov brothers, Sovanna, Sowalnut, and Sovannak, by their first names.  All others are identified by their last names.

2

phone, he was overheard saying to the person he had called, "There's bitches over here; come over."

Later, a group of others arrived at the front gate, seeking entry. A confrontation ensued, with Kim's friends trying to enter, and Sowalnut's family and friends trying to block their entry. The newcomers became more aggressive, pushing, shoving, and shouting the Asian Boyz gang identification. They then drew back from the confrontation, and began to leave the area. At that point, Kim retrieved a handgun from his companion's purse, pointed it at Sowalnut's head at close range, and asked, "How come you didn't just let us in the party?" After stepping back and shooting three or four shots into the air, Kim left with his friends, saying he would return.

Someone called the police, who came and told the partygoers to end the party. Most left, but a few relatives and friends stayed to help clean up.

### Second shooting

About one-half hour to one hour later, Sopheap Tath, a Pov family friend, saw three people walk toward the gate from the outside before he heard a few shots being fired from their direction. Sowalnut was in the driveway arguing with his friend Satiya Sokun about having let Kim into the party when he saw flashes of light and heard about three gunshots from outside the front gate. Sowalnut saw Sokun fall to the ground. He pulled Tran to the ground, then turned around to see his younger brother Sovannak rise from where he had been sitting, grab his shoulder, then fall to the ground while screaming to call an ambulance. Tath said that Kim and two other men fired at Sokun, and the three then ran down the street.

Sokun was hit by 10 shots; Sovannak was shot once in the neck and chest. Both Sovannak and Sokun died at the hospital that night.[5]

### Shooters' identity

Sowalnut, Tath, and Tran all testified that because of the low light and shadows, they could not see the shooters' faces and could give only general descriptions of those

_____

[5] The police responded to the second shooting call at 12:25 a.m. on January 21, 2007, although some witnesses thought it had been earlier than that.

3

they did not know. When Tath was interviewed the next day he identified Kim as one of the shooters. He described all three shooters as being roughly similar in height, all shorter than his own height of 5 feet 10 inches.

Tran's 16-year-old sister Tuyet Nguyen and her friend Kara Sem were interviewed nearly 10 months after the January 2007 shootings. They both initially denied knowledge of anything related to the second shooting incident, saying they had left the party after the first incident. After a few hours of unrecorded police questioning, however, during which they gave inconsistent denials and stories, each provided a recorded statement admitting to having witnessed the shootings, and identifying Oeun and Soeur (who they knew) as participants in the shooting. Nguyen and Sem both said they initially had not wanted to testify out of fear of gang retribution.[6]

Nguyen had testified at the 2008 preliminary hearing and the 2010 trial, and repeated at the 2013 trial, that her 2007 statement identifying Oeun and Soeur as shooters was fabricated, resulting from police pressure because she had been on probation, she had been under-age (and drinking at the party), and she said what she believed the police wanted to hear so she could end the questioning. She testified that she and her friends had left the party after the first shooting, and that they had not been present when the second shooting took place. Sem confirmed Nguyen's explanation that most of what she had told the police—including her identification of Oeun and Soeur as shooters—had been false, and that she had left the party before the second shooting had occurred.

Tran lived out of state and was unavailable at the time of the 2013 trial. In her 2010 trial testimony, which was read to the jury, Tran confirmed that her sister Nguyen had left, at Tran's request, when the party ended after the first shooting incident. When the second shooting occurred only a small group of family and friends had remained to clean up. Tran was in the driveway near the garage in the rear when the shooting occurred. She saw flashes from the gunshots, but did not see the shooters.

---

[6] Nguyen said she feared Kim, but not Oeun or Soeur.

4

A witness who had been parked nearby shortly before midnight had seen a car driving past the Downey Street house a number of times shortly before he heard shots fired. The car he had seen might have been that of an associate of the shooters named Samrong You, and was also similar in color and make to Oeun's car.

*Searches of Oeun's and Soeur's residences*

On November 15, 2007, after both Oeun and Soeur had been arrested for murder, the police searched their residences pursuant to warrants. At Soeur's residence they found a .45-semiautomatic handgun, several boxes of ammunition, some loose live rounds, spent casings, and handgun magazines. The ammunition was of several calibers, including .45 and nine-millimeter.

Oeun's girlfriend, Navy Phom, was present when Oeun's residence was searched. When Oeun later spoke to her from jail she described the search to him. He then mentioned that the police had not found a gun (using the Cambodian word for it), and she immediately told him to be quiet. That was because after the search she had opened a VCR (or similar electronic device) in which she had a few months earlier seen him put something, and she saw a gun. She then gave the VCR with the gun inside to a friend of Oeun's. The police listened to the jailhouse call, obtained from Phom the information about where she had taken the VCR, and obtained the VCR and gun—a nine-millimeter Smith and Wesson pistol loaded with a magazine holding 14 bullets.

*Ballistics evidence*

A police expert testified that three semiautomatic weapons—two .45-caliber semiautomatics, and one nine-millimeter semiautomatic—had been fired at the Downey residence shooting. Not all the casings found at the site could be identified; while the expert found no evidence that a revolver had been used, he could not completely exclude that possibility. None of the nine-millimeter cartridge cases found at the site had been fired from the gun found in Oeun's VCR. Although none of the bullet fragments found at the scene could be positively identified as having been fired from that (or any other) particular gun, they did share the same class characteristics as the barrel rifling of the gun found in Oeun's VCR, and that gun therefore could not be ruled out as their source.

5

*Gang evidence*

Kim was an admitted member of the Asian Boyz gang, and had one or more gang tattoos. A gang expert testified that Soeur was an admitted Asian Boyz member. The expert testified, based on Oeun's associations with Asian Boyz members, that he, too, was an Asian Boyz member. Phom testified that her own brother was an Asian Boyz member and that Oeun had occasionally associated with Kim and other Asian Boyz members, but that Oeun was not a member.

**Discussion**

Oeun does not contest the sufficiency of the evidence to support his convictions. His appeal rests on allegations of error and violation of his constitutional rights in the admission of evidence, and in the refusal of requested instructions to the jury.

**1.      The trial court did not err in permitting a courtroom comparison of the relative heights of Oeun, Soeur, and Kim.**

Identification was a critical element of the prosecution's case against Oeun. No witness at the trial (or in the 2008 and 2010 preliminary hearing and trial proceedings) identified either Oeun or Soeur as participants in the crime. Tath identified Kim (whom he knew) as one of the shooters, but could not identify the two other shooters he had seen. The only specific identification of Oeun as a participant in the shooting came from recorded out-of-court statements to the police by Nguyen and Sem, which contradicted other accounts they had given before their statements were recorded, and which they repudiated in their courtroom testimony. In their initial statement to the police, and in their later sworn testimony, Nguyen and Sem said they had left when the party ended, before the fatal shooting incident. However, in a recorded portion of the police interview Nguyen and Sem had identified Oeun and Soeur, along with Kim, as the shooters at the second shooting.

During Tath's trial testimony the prosecution was permitted (over objection) to bring Kim into the courtroom and to have him stand next to Oeun and Soeur, permitting Tath (and the jury) to observe their relative heights. After seeing Kim standing next to

6

Oeun and Soeur, Tath testified that Oeun and Soeur had the same general build as the two people with Kim at the shooting, and that each of them was an inch to a few inches taller than Kim.

Soon after the shooting Tath had described the two other shooters he could not identify as a couple of inches taller than Kim. The evidence was that Kim was 5 feet 6 inches or 5 feet 7 inches tall at the time of the shooting in 2007. According to the information, at the time of the shooting Oeun was 19 years old, Soeur was 17 years old, and Kim was 20 years old.

Oeun contends on appeal that the evidence provided by this courtroom demonstration was irrelevant, because it lacked foundational evidence that the circumstances at the time of the 2013 trial were substantially similar to those at the time of the 2007 shooting. Because there was no evidence that the three men had not grown in height or had all grown at the same rate in the six and one-half years since the shooting, he contends that permitting this courtroom demonstration was a prejudicial abuse of the trial court's discretion.

The trial court had discretion to permit the challenged height comparison. To justify the use of a courtroom demonstration, there must be foundational evidence that the demonstration is conducted under conditions "'the same as or substantially similar to those of the actual occurrence,'" and that it will not be likely to confuse the issues or mislead the jury. (*People v. Jones* (2011) 51 Cal.4th 346, 375.) However, the conditions need not be shown to be absolutely identical. (*Ibid.*)

The evidence showed that a number of circumstances might have changed since the shooting. Tath testified that one of the shooters was a couple of inches taller than Kim as they stood together at the time of the shooting, and that Oeun was also a couple of inches taller than Kim as they stood together in the courtroom in 2013. He also testified that this was consistent with his 2010 testimony about the relative heights of the three shooters.

But the jury also knew that Kim and the charged shooters had each aged by six and one-half years since the shooting, indicating the possibility that their relative heights

7

had changed during that time—a possibility that is within the experience and understanding of any adult, and is not likely to confound jurors. Moreover, the jury also had heard evidence that at the time of the shooting Oeun and Soeur were both shorter, not taller, than Kim, who was then 5 feet 6 inches or 5 feet 7 inches tall. Oeun was identified as 5 feet 5 inches tall (according to his police booking information) or 5 feet 3 inches or 5 feet 4 inches tall (according to Tran). The prosecution and the defense both discussed and explored the consequences of these evidentiary discrepancies and possibilities in their arguments to the jury. This evidence provided the jurors with sufficient foundation to evaluate the weight to be afforded to the witnesses' various descriptions of what they saw at the time of the shooting, and to determine whether and how those descriptions supported or undermined other descriptions of the shooters' relative heights.

Permitting the courtroom height comparison might have assisted them in that task, and was unlikely to have caused any confusion in the jury. It was within the trial court's discretion.

2.     **The trial court did not abuse its discretion or violate Oeun's due process rights by admitting evidence of anonymous threats perceived by prosecution witness Tath.**

Oeun argues that the trial court erred by permitting Tath to testify, over defense objection, about his fear of testifying. He testified that he had heard rumors from a friend that unnamed people were looking for him, that his resulting fear had led him to try to avoid being seen by spectators when he testified in 2010, and that he had sought and obtained assistance from the prosecutor and the Long Beach Police Department in relocating his residence.[7] Oeun's counsel objected that the testimony was not relevant,

---

[7] Tath testified that he learned from "a buddy" that "these guys were looking for me," and that he knew they were connected with the defendants' gang. With the help of the prosecutor and the Long Beach police he had changed his residence. Although he had not personally been threatened by anyone, he said that he nevertheless had fears every time he testified about the shooting.

8

that its prejudicial impact would outweigh any probative value, and that it violated his due process rights under the Fourteenth Amendment.[8]

Under California law, "'"'Evidence a witness is afraid to testify is relevant to the credibility of that witness and is therefore admissible. [Citations].)'"'"' (*People v. Williams* (2013) 58 Cal.4th 197, 270.) The explanation of the basis for the witness's fear is relevant to the witness's credibility, and is within trial court discretion to admit. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 946; Evid. Code, § 780, subds. (f), (j).)[9] The relevance of testimony that a witness fears retaliation for his or her testimony does not depend on proof that the fear is reasonable, or that it has its source in any direct or indirect threats originating with the defendant. (*People v. Williams*, *supra*, 58 Cal.4th at p. 270; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1084-1086.) The trial court therefore did not err in ruling that evidence of Tath's fear of testifying was relevant and admissible—"[e]xcept as otherwise provided by statute." (Evid. Code, § 780.)

---

[8] Respondent suggests that Oeun has forfeited his claim that this testimony violated his federal due process rights by failing to identify those constitutional grounds in the trial court. However, counsel did argue in the trial court that Oeun's due process rights were infringed by the rulings concerning Tath's testimony about the source of his fears. This distinguishes the cases on which the prosecution's forfeiture argument relies. (See *People v. Williams* (1997) 16 Cal.4th 153, 208-209 [failure to object to testimony about fear of testifying]; *People v. Rowland* (1992) 4 Cal.4th 238, 265, fn. 4 [failure to identify constitutional grounds when objecting]; *People v. Price* (1991) 1 Cal.4th 324, 430 [no objection to lack of foundation for challenged evidence].) Moreover, the Supreme Court held in the more recent case of *People v. Yeoman* (2003) 31 Cal.4th 93, that an objection asserted in the trial court on due process and equal protection grounds was sufficient to support appellate review on Eighth Amendment grounds, where the appellate argument "merely invites us to draw an alternative legal conclusion . . . from the same information he presented to the trial court . . . ." (*Id*. at p. 133, fn. 9.)

[9] Evidence Code section 780 provides in relevant part that, except as otherwise provided, "the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] . . . [¶] (f) The existence or nonexistence of a bias, interest, or other motive. [¶] . . . [¶] (j) His attitude toward the action in which he testifies or toward the giving of testimony."

As Oeun correctly argues, however, the fact that the evidence is prima facie relevant does not fully resolve the issue. Evidence Code section 352 affords the trial court broad discretion to exclude or limit otherwise admissible evidence, where its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice. On that basis Oeun argues that the admission of evidence of Tath's perceived threats and fear of testifying, unconnected by evidence to Oeun or his codefendant in this trial, amounted to constitutionally impermissible prejudice, requiring its exclusion. For that proposition he relies on a number of California decisions, and a decision of the federal Court of Appeals for the Seventh Circuit, in *Dudley v. Duckworth* (7th Cir. 1988) 854 F.2d 967.[10]

The California Supreme Court has in a number of decisions attempted to balance the competing interests arising from evidence of a witness's fear of retaliation for his or her testimony, on one hand, and the resulting prejudice to the defendant when no evidence connects the defendant to the perceived threat. In none of those cases, however, has the court found error or undue prejudice in the admission of such evidence where it is offered to show the witness's state of mind, even where no evidence shows that the defendant was the source of any threat.

In *People v. Hannon* (1977) 19 Cal.3d 588, a prosecution investigator testified that a defense alibi witness had refused to speak with him, telling the investigator that an unidentified attorney had instructed him not to speak to anyone from the prosecution. The Supreme Court approved the admissibility of testimony about the alleged suppression attempt as relevant to the witness's own bias and credibility, "not because the refusal to discuss the case may have been the result of one party 'ordering' such silence but simply because the favoritism shown by the witness demonstrates the possibility of bias on his part towards the favored party." (*Id.* at pp. 601-602.) Although the court in

---

[10] Oeun has not appealed from the admission of Nguyen's and Sem's testimony that they had heard rumors of threats and had been afraid of retaliation by the Asian Boyz gang. Nguyen also testified that although she did not fear either Oeun or Soeur, she did fear Kim.

10

*People v. Hannon* also held that the testimony was insufficient to support an instruction that the defendant's consciousness of guilt could be inferred if the jury concluded that the defendant's attorney had ordered the witness's refusal to speak with the investigator (*id.* at p. 599), the court has since explained that the distinction arises when the evidence of threats is used to show consciousness of guilt, rather than the witness's state of mind and credibility. (*People v. Abel* (2012) 53 Cal.4th 891, 924-925 [cases holding threats inadmissible without evidence that they are connected to defendant apply only when the evidence is offered to show consciousness of guilt, not witness credibility, citing *People v. Weiss* (1958) 50 Cal.2d 535, 554, *People v. Gilliland* (1940) 39 Cal.App.2d 250, 255-257, *People v. Burke* (1912) 18 Cal.App. 72, 91-92].)

In *People v. Burgener* (2003) 29 Cal.4th 833, the Supreme Court reaffirmed that "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible," and that "[a]n explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court." (*Id.* at p. 869.) The court also noted, however, that the trial court had "promptly and correctly" instructed the jury that the evidence could be used only as it may relate to the witness's credibility. (*Id.* at pp. 869-870.)

In *People v. Gray* (2005) 37 Cal.4th 168, a defense witness had recanted his pretrial statement about the defendant's incriminating admissions, while admitting that the defendant's family members had told him they did not like snitches. The prosecutor argued to the jury that it could infer that it was the witness's fear of having to confront the defendant in the courtroom that caused him to recant his earlier statement. The Supreme Court held that defense counsel's failure to object and to request an instruction limiting use of the testimony to the witness's credibility was reasonable. The prosecution's argument to the jury did not accuse the defendant of making any threat, and "[i]n any event, '[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness,'" and within the court's discretion to admit. (*Id.* at p. 220; see *People v. Williams*, *supra*, 58 Cal.4th at pp. 270-271 [evidence of threats, whatever their source, is relevant and admissible as to the witness's

11

credibility; no error or prejudice in admitting evidence where jury is told there is no evidence that defendant made any threat].)

*Dudley v. Duckworth*, *supra*, 854 F.2d 967, does not require a contrary conclusion in the case at hand. There, the Seventh Circuit Court of Appeals held that the admission of evidence of a third party threat, not connected to the defendant "except by prejudicial innuendo," deprived the defendant of due process of law in violation of the Fourteenth Amendment to the federal Constitution, requiring reversal of his conviction unless the resulting prejudice could be negated beyond a reasonable doubt. (*Id.* at p. 972; *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].) However, the California Supreme Court has addressed and distinguished *Dudley v. Duckworth* in a number of cases, where the jury's use of the evidence was limited to evaluation of witness credibility, or the jury was told that the defendant was told that was not connected with the threats. (*People v. Wharton* (1991) 53 Cal.3d 522, 566, fn. 9 [curative instruction limiting the use of the evidence of alleged threats]; *People v. Mason* (1991) 52 Cal.3d 909, 947, fn. 17 [jury informed by prosecution that the defendant was not directly or indirectly connected with threats].)

Oeun can take no comfort from the cases approving the admission of evidence of threats where the jury's use of the evidence has been limited to evaluation of witness credibility. In this case the record shows beyond question that the jury was well aware of the source of the witnesses' fear and of any threats. Although Kim was not a defendant in the 2013 trial, the only evidence was that he was the instigator of the shooting incidents, and that he was an admitted member of the Asian Boyz gang (evidenced by, among other things, the prominent "Asian Boyz" tattoo on the back of his head). The jury also found (on evidence that Oeun does not contend was insufficient) that Oeun and his codefendant were also either members of the Asian Boyz gang, or (in the case of Oeun) at least closely involved with its members.

There was no evidence that either Oeun or Soeur was directly connected with any threat to any witness (nor did the prosecution argue to the jury that they were). But the defendants' gang affiliations, and the role (if any) of those affiliations in the shootings,

12

was not just an element of certain of the charged offenses; it was also evidence that the jury could find relevant in determining the shooters' identity. The evidence was uncontradicted that the participants in the incidents—both the initial confrontation and the later fatal shootings—had Asian Boyz gang connections, of which all the witnesses to the shootings were aware. As Kim and his friends had become aggressive when they were barred from entry into the party, witnesses had heard shouts of the Asian Boyz gang identification. When Kim shot repeatedly into the air during the initial confrontation, they heard his warnings that they would return, saying "Watch your back," and "You'll see what happens tonight," or "I'll be back to shoot up this house."

The witnesses to the incidents were aware not just of the specific threats of future retaliation at the time of the incidents, but also of general (and in one case specific) threats of retaliation arising from the participant's gang affiliations. There was testimony that Christine Picado (who had come to the party with Kim and had held his gun in her purse until the shooting), had been physically attacked and accused by Asian Boyz members of being a snitch after talking to the police following the incident. Although Nguyen and Sem repudiated their identifications to police of Oeun and Soeur as two of the shooters, they also admitted their fear of gang retaliation (at least from Kim) for their testimony. Tath testified to rumors that he had heard from others, that someone was looking for him (which he believed emanated from the Asian Boyz gang), causing him to fear testifying and to move his residence with police department assistance. Phom was called to testify while she was in custody for having earlier failed to appear to testify; she had told her arresting officer that she had not appeared because she "didn't want to be known as a rat on the street."

The evidence of gang involvement in the shooting incidents was overwhelming; the evidence of the witnesses' fear of retaliation was universal. In this context, Tath's testimony about his fear of retaliation resulting from rumors someone was looking for him was just one piece of the larger picture of gang involvement—evidence to which Oeun did not object at trial and does not identify as a ground for his appeal. All of this evidence of Asian Boyz gang involvement was directly relevant to the jury's task of

13

determining how it should evaluate the testimony of the various witnesses. Tath's testimony—after the jury had heard of the gang involvement in the shooting incidents and of other witnesses' fears of retaliation—could not have prejudiced Oeun, who was not accused of being the source of any threat or rumor, or the cause of any fear.

The jury was instructed on the evidence it could use to evaluate the credibility of evidence, but it was not instructed that it could use the evidence of the witnesses' fear of retaliation, or any possible source of any such threat, only in evaluating the witnesses' testimony and not as the basis for an implication of the defendants' consciousness of guilt. No such limiting instruction was requested in this case—a failure the Supreme Court specifically held to be reasonable under circumstances very similar to those in this case. (*People v. Gray*, *supra*, 37 Cal.4th at p. 220.)

Nor was any such limiting instruction required. Here, just as in *People v. Gray*, the prosecution's argument to the jury did not accuse the defendant of making any threat, and no evidence at all suggested that Oeun was the source of any threat or fear of retaliation. (*Solgaard v. Guy F. Atkinson Co.* (1971) 6 Cal.3d 361, 370 [error to instruct jury on matter unsupported by evidence].)[11] And just as in *People v. Gray*, "[i]n any event, '[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness,'" and is within the court's discretion to admit. (*Id.* at p. 220; *People v. Abel*, *supra*, 53 Cal.4th at pp. 923-924 [evidence of witness's fear

---

[11] In its closing argument the prosecution argued (without objection) that the jury should use the witnesses' fear of retaliation to evaluate the evidence. The jury should disregard the suggestion that the police had intimidated witnesses to identify the defendants, because "the oppressors here are the gang members that distort the system and make it where people come to court and deny the truth that they've told the police. It's the fear that the defense is not addressing, and it happened with Sopheap [Tath], with Christy [Picado], with Navy [Phom], with Tuyet [Nguyen], with Kara Sem," citing further examples: witnesses like Phom and Tath are willing to risk arrest for refusing to testify rather than being known as a rat; Tath hid out of fear of testifying; Nguyen's sister tried to have Nguyen testify anonymously to avoid retaliation; assault on Picado linked to belief she might have identified gang members; refusal by Nguyen and Sem to identify the defendants is "because they believe these guys are from gangs, and they're scared for their families."

14

of retaliation for testifying "'is relevant to the credibility of that witness and is therefore admissible'"].)

The trial court did not err by permitting Tath to testify about his fear resulting from rumors that someone from the Asian Boyz was looking for him. There can be no inference that Oeun was unduly prejudiced by Tath's testimony, in light of the copious evidence of other witnesses' concerns about gang involvement and retaliation, and the absence of any evidence that Oeun (or his codefendant) was either the focus or the source of any of those concerns.

3. **The trial court did not err by refusing to instruct the jury that Samrong You, and not Oeun, might have been a perpetrator of the charged crimes.**

The jury was properly instructed that Oeun was to be presumed innocent, and that it was the prosecution's burden to prove his guilt of the charged offenses beyond a reasonable doubt. The jury was specifically instructed that if it had a reasonable doubt as to his guilt, he must be found not guilty. Oeun argues that those instructions were not enough. He appeals from the trial court's refusal of his request for an instruction that "[e]vidence has been presented tending to show that someone other than Defendant committed the offenses charged," and that if the evidence were to raise a reasonable doubt as to the defendant's guilt, he should be found not guilty.[12] The instruction was properly refused.

Trial courts are obligated to instruct a jury on the principles of law "that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case." (*People v. Carter* (2003) 30 Cal.4th 1166, 1219.) The defendant also has a right to instructions that pinpoint any theory of the defense that is supported by substantial evidence (*People v. Abilez* (2007) 41 Cal.4th 472, 517),

---

[12] The proffered instruction read in full: "Evidence has been presented tending to show that someone other than Defendant committed the offenses charged. It is not required that Defendant prove this fact beyond a reasonable doubt, he need only raise a reasonable doubt as to his guilt. [¶] If after consideration of all the evidence presented, you have a reasonable doubt that the Defendant committed the offenses charged you must give the defendant the benefit of the doubt and find him not guilty."

15

including an instruction that relates particular facts to a legal issue (*People v. Sears* (1970) 2 Cal.3d 180, 190), or that pinpoints the crux of the defendant's case. (*People v. Adrian* (1982) 135 Cal.App.3d 335, 337.)

But this does not require that the trial court must instruct the jury as to any factual theory on which the defense bases its claim for acquittal. The rule applies only to matters that would constitute a defense to the crime, that would show the nonexistence of an essential element of the crime, or that would compel a reduction in the degree of the crime. (*People v. Adrian*, *supra*, 135 Cal.App.3d at p. 341.) However, it is not the trial court's role to instruct the jury about certain evidence that "might give rise to a reasonable doubt as to the affirmative of an issue required to be proven by the prosecution." That would constitute a comment on the evidence, rather than an appropriate instruction to the jury on the law. (*Ibid.*)[13]

Oeun's appeal argues that four facts amount to substantial evidence constituting a defense to the charged shootings, demonstrating his entitlement to the proffered instruction. He first contends that the evidence shows that You is a closer fit than Oeun to various witnesses' descriptions of one of the shooters (which, he says was the shooter that the prosecution theorized was Oeun). Specifically, You had black shoulder-length hair. But Tath testified that of the three shooters he saw, Kim was bald, one of the other shooters was also bald, and the other had shoulder-length hair. Nguyen had said in the recorded interview (in which she had identified Oeun and Soeur) that all three were bald or nearly bald on the night of the incident. Even construed most favorably toward Oeun,

---

[13] In *People v. Adrian*, *supra*, the court held that the defendant was entitled to an instruction pinpointing his affirmative defense of justification, but found that the instructions given to the jury adequately pinpointed the defense. (*People v. Adrian*, *supra*, 135 Cal.App.3d at p. 342.) In *People v. Hall* (1986) 41 Cal.3d 826, cited by Oeun, the Supreme Court clarified the rules relating to admissibility of evidence that someone other than the defendant committed the charged offense, but it did not discuss the necessity or propriety of a jury instruction on the issue.

16

the first cited fact shows merely that there was some evidence that one of the shooters had long hair, and that You had long hair.[14]

Oeun cites as a second fact showing that You was guilty of the shooting and that Oeun was not, and that a witness identified You's car (a dark Honda with distinctive red wheel rims) repeatedly driving by the Downey Street residence shortly before the shooting. But that evidence neither constitutes a defense, nor shows the nonexistence of an essential element of the crime. It does not show that You stopped or left his cruising car, and it does not in any way preclude a determination that both Oeun and You could have been involved in the shooting. Construed most favorably toward Oeun, the second cited fact therefore does not show that You was involved in the shooting, much less that Oeun was not.

The third fact cited to support Oeun's theory is that You was in Kim's presence at a nearby location the afternoon following the shooting (when he was arrested on an unrelated marijuana possession charge). That fact, too, could hardly support a suspicion that You might have been involved in the previous night's shooting, and does nothing to show that Oeun was not involved.

The final fact cited to support Oeun's theory is that although the police dusted You's car for fingerprints the day following the shooting (in connection with the unrelated arrest), the detective investigating the shooting instructed that the car's latent prints should not "yet" be compared with the police database of known prints. Oeun does not explain how he believes this evidence would provide him with a defense to the charges against him, or could indicate even that You was guilty of them.

The record therefore does not support Oeun's claim of entitlement to the proffered instruction, even on its own terms. More importantly, the theory that You, not Oeun, was guilty of the shootings, does not fulfill the requirement that it constitute an affirmative

---

[14] The length of Oeun's hair at the time of the incident would have been apparent to the jury from contemporaneous photographs. The portions of the record cited by Oeun do not support his contention that the shooter identified by Tath as having long hair was the one that the prosecution theorized was Oeun.

17

defense to the charged crimes, or show the nonexistence of an essential element of the crime. Rather, it would simply constitute evidence that, if accepted by the jury, might at most give rise to a reasonable doubt as to whether the prosecution had carried its burden of proving Oeun's guilt. On that subject, the instructions given by the court thoroughly informed the jury of the prosecution's burden of proof, and its duty to acquit Oeun if it had a reasonable doubt as to his guilt.

**4. The trial court did not err by refusing to instruct the jury that it could infer Samrong You's consciousness of guilt from his failure to appear to testify.**

After Oeun's counsel advised the court that You did not appear to testify pursuant to the subpena issued by the defense for his appearance at trial, the trial court issued a bench warrant (which also did not result in to his appearance). On that basis, Oeun's counsel requested a jury instruction explaining You's failure to appear, inviting the jury to consider his failure to appear as a circumstance tending to prove a consciousness of guilt, and telling the jury that his failure to appear may be sufficient to raise a reasonable doubt as to Oeun's guilt. The trial court declined to give the requested instruction, explaining both that it was unclear why You had failed to appear, and that the case was not a third party culpability case—meaning that proof of You's guilt would not establish that Oeun was not guilty of the charged crimes.[15]

The trial court did not err, for the reasons discussed with respect to Oeun's request for a jury instruction that You, and not Oeun, might have been a perpetrator of the charged crimes. Uncertainties in the evidence left ample room for Oeun's counsel to argue that the jury should have substantial doubts about Oeun's guilt, based on deficiencies in the investigation of You's possible involvement—as his counsel

---

[15] There was some evidence that there were four participants in the shooting, not three.

18

appropriately did. But even if some evidence indicated You's possible involvement in the shootings, it did little or nothing to show that Oeun was free from involvement.[16]

The trial court correctly found that You's failure to appear to testify was not a factor that could justifiably provide additional fuel for that fire. And even if that ruling had been error, the lack of any substantial prejudice is shown by the fact that You's possible involvement in the shooting would not show Oeun's lack of guilt.

**5.      The trial court did not err in admitting evidence about the gun found at Oeun's residence.**

Over the defendants' objections, the prosecution was permitted to present evidence of the gun found in Oeun's VCR, and the manner it had been obtained. The objection was that the gun was irrelevant to any legitimate issue in the case, because no evidence connected it with the charged offenses. The trial court ruled the evidence admissible, adopting the prosecution's argument that Oeun's possession of a gun that could have been one of the guns used in the charged crimes had a tendency in reason to connect Oeun with them.

No evidence directly connects the pistol found in Oeun's VCR to the charged murders; the evidence was that the gun could have been the source of certain of the bullet fragments, although it was not the source of any of the cartridge casings found at the scene. A criminologist testified that of the 22 cartridge casings found at the scene, seven were fired from one .45-caliber semiautomatic pistol, 10 were fired from another .45-caliber semiautomatic pistol, and five were fired from a nine-millimeter semiautomatic pistol (with the same general characteristics as the pistol found in Oeun's VCR). The casings and bullets provided no evidence of a fourth gun, nor was the evidence sufficient

---

[16] Oeun has not cited any offer of proof in the trial court identifying what the jury would have learned from You's testimony, had he appeared.

to exclude the possibility that a fourth gun—either a semiautomatic pistol or a revolver—had been used in the shootings.[17]

None of the five nine-millimeter semiautomatic firearm casings found at the scene had been fired by the weapon found in Oeun's VCR, nor could they be connected to any other gun the witness could identify. But the expert could not exclude the possibility that some of the bullet fragments recovered from the scene of the shootings might have come from that gun. Four bullet fragments found at the scene had class characteristics different from either of the two .45-caliber guns that had been identified from the bullet casings. Those fragments could not be identified as necessarily having been fired from the same weapon, or from any .45-caliber gun; they could have been fired from a nine-millimeter firearm. A small piece of copper jacket found at the scene could have been shot from either a revolver or an automatic firearm, and could have come from a cartridge shot from a pistol within the category of firearms that includes nine-millimeter pistols such as the one found in Oeun's VCR.

Oeun bases his contention that admission of the gun evidence was error on the case of *People v. Barnwell* (2007) 41 Cal.4th 1038. In *People v. Barnwell*, the defendant was convicted of murder based on eyewitness evidence of him shooting, the witness's precise identification of the murder weapon found nearby, the presence of a matching bullet in the defendant's pocket, and the match of the bullets recovered from the victims' bodies with the gun the defendant had been holding as he ran from the scene of the shooting. The trial court had permitted the prosecution to introduce evidence that the defendant had previously possessed another handgun similar to the murder weapon, offered to demonstrate his propensity to carry that type of weapon, under section 1101,

---

[17] The distinction between semi-automatic pistols and revolvers was significant, because a semi-automatic pistol generally ejects its spent cartridge casing when each shot is fired, but a revolver's casings generally stay inside the weapon until they are manually ejected.

subdivision (b) of the Evidence Code. (*Id.* at p. 1056.)[18] The Supreme Court concluded that the trial court had erred in admitting the other weapon evidence, because it was not relevant to any issue in the case and therefore lacked probative value. It held that "[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Ibid.*, citing *People v. Cox* (2003) 30 Cal.4th 916, 956, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Riser* (1956) 47 Cal.2d 566, 577.)

This case differs significantly from *People v. Barnwell*, *supra*, however. There, the error was that the evidence had been offered to show the defendant's "'*propensity* to own or carry that type of weapon,'" (41 Cal.4th at p. 1056), based only on the contention that it was "another handgun similar to the murder weapon," but not that it was itself the murder weapon. (*Ibid.*) But here, the forensic evidence was that both .45-caliber and nine-millimeter semiautomatic pistols (and possibly even other guns) had been used. The nine-millimeter semiautomatic pistol found to have been in Oeun's possession was within the same category of weapons as one or more of the guns used in the shootings, and therefore—unlike in *People v. Barnwell*—might itself have been one of the guns used in the charged crimes.

Any evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" is relevant (Evid. Code, § 210), and therefore prima facie admissible. (Evid. Code, § 351.) The evidence of Oeun's

---

[18] Evidence Code section 1101, subdivision (a) provides that, except has provided in certain specified sections, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Evidence Code section 1101, subdivision (b), provides in pertinent part: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . .) other than his or her disposition to commit such an act."

possession of the nine-millimeter gun was not admitted to show Oeun's propensity to possess dangerous weapons, the purpose for which it would have been inadmissible. (*People v. Barnwell*, *supra*, 41 Cal.4th at p. 1056 & fn. 13.) The evidence was admitted to show that Oeun possessed a weapon that might have been one of those used in committing the charged crimes. Far from holding that evidence of Oeun's possession of the nine-millimeter gun was not relevant to connect him to the charged crimes, the *People v. Barnwell* decision is entirely consistent with the longstanding rule that "[i]f the specific type of weapon used to commit a homicide is not known[,] *any weapons found in the defendant's possession after the crime that could have been employed are admissible.*" (*People v. Ringegold* (1970) 13 Cal.App.3d 711, 720, original italics.)[19]

In order to be relevant and admissible to establish Oeun's possession of a weapon used in the murder, "[t]here need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon." (*People v. Ringegold*, *supra*, 13 Cal.App.3d at p. 720 [any weapons in the defendant's possession that could have been used in the crime "are admissible"].) It is enough that the evidence shows that "it might have been" the weapon used by the defendant. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1052 [gun evidence is relevant and admissible, because "Although the witnesses did not establish the gun necessarily was the murder weapon, it might have been"].)

Here, the forensic evidence did not establish that the gun recovered from Oeun's VCR was necessarily used in the shooting. But it did establish, consistent with the forensic evidence, that it *could have been* one of the guns used in the shootings. The nine-millimeter pistol found in Oeun's VCR was consistent with some of the bullet fragments found at the scene (although those fragments were also consistent with a

---

[19] The prosecution argued also that the evidence that Oeun intimated to Phom that she should get rid of the gun hidden in the VCR, after learning after his arrest for murder that it had not been found in the search of his residence, tended to implicate Oeun in the shooting incident. Unless the gun was connected with the murder, the prosecution argued, why would he be concerned about its disposal after his arrest?

22

revolver, which would have left no casings at the scene (as well as with the possibility that an unidentified gun was wielded, but not actually fired, by one of the intruders).[20]

The evidence, though far from conclusive proof of Oeun's involvement in the murders, nevertheless was some evidence of that disputed fact. (See *People v. Cox*, *supra*, 30 Cal.4th at p. 956, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22 [evidence of gun in the defendant's possession is admissible unless it is positively excluded as a possible weapon in the charged crime].) As in *People v. Carpenter*, *supra*, 21 Cal.4th at page 1052, although the evidence did not establish that "the gun necessarily was the murder weapon," the evidence did establish that "it might have been." For that reason, the trial court correctly found that the evidence was at least minimally relevant.

However, the prima facie relevance and admissibility of the evidence is not the end of the inquiry. Oeun's counsel objected to testimony about the gun found in the VCR, arguing that "if a gun found is not the murder weapon," but is only *similar* to a weapon used in the crime, the evidence of its possession by Oeun could only establish his character and propensity to have such a weapon—grounds for which the evidence is not admissible. Counsel sought a hearing under Evidence Code section 402, apparently to establish whether the gun found in the VCR was or was not a gun used in the crime—a motion the court denied.[21]

---

[20] Witnesses had seen four or more people approaching immediately before the shooting began; and Sem had told the police that she had seen Kim, Soeur, and Oeun— and perhaps one other person—with guns. From this evidence the jury could have concluded that there were four shooters, that one of the shooters used a revolver (which would have left no spent casings at the scene), or that not all of those with guns actually fired shots.

[21] In objecting to the evidence of the gun found in Oeun's VCR and seeking a hearing under Evidence Code section 402, counsel did not specifically mention Evidence Code section 352. However both the trial court and counsel all plainly understood the prejudicial impact of the gun evidence to be the basis for the objection. The whole point—the only issue for which the evidence could be relevant—was as a weapon used in the crime; if it were to be established in the section 402 hearing that it was not a weapon

The abuse of discretion standard governs our review of the trial court's rulings on the admissibility of the evidence. (*People v. Cox*, *supra*, 30 Cal.4th at p. 955; *People v. Waidla* (2000) 22 Cal.4th 690, 724.) In light of the straightforward Supreme Court authority on the subject, we are unable to find that the trial court erred in admitting the gun evidence. In *People v. Riser* (1956) 22 Cal.2d 566, the court found error (but no prejudice) in the trial court's admission of evidence that the defendant possessed a weapon that could not have been the weapon used to commit the charged murder, stating the rule of admissibility: "When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in the defendant's possession was the murder weapon." (*Id*. at p. 577.) In *People v. Carpenter* (1999) 21 Cal.4th 1016, reaffirmed that rule, finding the admission of evidence the defendant possessed a gun to be relevant and admissible circumstantial evidence that the defendant committed the charged offense. "Although the witness did not establish that the gun was necessarily the murder weapon, it might have been." (*Id.* at p. 1052.) In *People v. Cox*, *supra*, 30 Cal.4th at page 955, the court found no error in the trial court's admission of evidence that the defendant possessed guns, where it could not be determined whether the victim's death had resulted from being shot, strangled, poisoned, or otherwise assaulted. On that record, the guns were relevant as possible murder weapons. (*Id.* at p. 957.)

Oeun's presence at the party was unquestioned, but none of the trial witnesses testified that he was one of the shooters. Tath testified that he recognized Kim as one of the shooters, but he could not identify the other shooters, whose faces he did not see and whom he did not know. The jury heard Tran's former testimony that she did not see the shooters. Oeun was identified as one of the shooters only in the out-of-court statements of Nguyen and Sem (who were 16 and 17 years old at the time of the shooting), recorded

used in the crime, the evidence that Oeun possessed the gun would have no probative value at all, but could only prejudice him in the jury's eyes.

24

by police about nine months after the incident, after some hours of questioning. In their recorded statements Nguyen and Sem said that there were three shooters, one of whom they identified as Oeun (whom they had known for some time). But in their earlier unrecorded statements to the police, in their previous testimony in court, and in their testimony at this trial, they insisted they had left the party after the first shooting incident, and were no longer present when the fatal shootings took place. They testified that they told the police otherwise only under pressure and to end the questioning.

On this record, the evidence that Oeun possessed a gun that could have been one of the weapons used in the charged crimes might well have influenced the jury in arriving at its verdict, and in that sense might have prejudiced his defense. However, in light of the Supreme Court's unequivocal holdings that such evidence is admissible upon precisely the grounds for which it was admitted here, despite its obvious prejudice to the defendants in those cases, we are unable to conclude that the properly admitted gun evidence was *unduly* prejudicial.

**6.    Denial of motion for new trial**

Oeun cites error in the trial court's refusal to grant his motion for new trial, on the ground that the verdict was contrary to the weight of the evidence. He correctly notes that he cited that ground in his new trial motion, and that such a defect is a valid ground for a new trial motion. (Pen. Code, § 1180.) But citing that ground for the motion is not enough to preserve the issue for appeal, for his motion contains nothing in its support beyond the citation of that phrase. Beyond the notice of motion and statement of facts, the moving papers have just one argument, challenging 10 specified rulings on "Questions Of Law." No heading, discussion, or citation of evidence or authority addresses the weight of the evidence—the sole subject sought to be raised in the appeal from the denial of a new trial. On this record, we conclude that the challenge to the ruling on the new trial motion has not been preserved for review. (*People v. Dykes* (2009) 46 Cal.4th 731, 808, fn. 22 [failure to raise specific grounds for new trial motion in trial court forfeits appeal based on those grounds].)

25

**7. Cumulative evidence**

Oeun's contention that his conviction must be reversed for cumulative error fails in the face of our determination that the trial court did not err with respect to the rulings challenged by his appeal.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

JOHNSON, J.